453 F.2d 810
 79 L.R.R.M. (BNA) 2128, 67 Lab.Cas. P 12,322
 NATIONAL LABOR RELATIONS BOARD, Petitioner, and Local Union
No. 252, Lithographers-Photoengravers International Union,
AFL-CIO, Intervenor,
v.
SAYERS PRINTING COMPANY, Respondent.
LOCAL UNION NO. 252, LITHOGRAPHERS-PHOTOENGRAVERS
INTERNATIONAL UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 Nos. 71-1111, 71-1143.
 United States Court of Appeals,
Eighth Circuit.
 Dec. 31, 1971.
Petition for Review and Application for Enforcement of Order
of N. L. R. B. Denied Jan. 27, 1972.
 
 Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Abigail Cooley Baskir, Elaine F. Palumbo, Frank Vogl, Attys. N.L.R.B., Washington, D. C., for N.L.R.B.
 John H. Doesburg, Phoenix, Ariz., for Sayers Printing Co.
 Bruce S. Feldacker, Stanley R. Schuchat, Schuchat, Cook & Werner, St. Louis, Mo., for Local Union No. 252, Etc.
 Before GIBSON, BRIGHT and ROSS, Circuit Judges.
 ROSS, Circuit Judge.
 
 
 1
 The National Labor Relations Board (Board) determined that respondent-employer, Sayers Printing Company (Company), had committed unfair labor practices in violation of Secs. 8(a) (1), 8(a) (3), and 8(a) (5) of the National Labor Relations Act. (29 U.S.C. Secs. 158(a) (1), 158(a) (3), and 158(a) (5).) The Board issued an order requiring the Company to cease and desist from action hereinafter described which it deemed to be threatening and coercive and from other alleged unfair labor practices and further requiring the Company to reinstate three employees and reimburse them for lost wages resulting from their alleged unlawful discharges. In addition, the Board set aside the representation election and ordered the Company to bargain with Local Union No. 252, Lithographers-Photoengravers International Union AFL-CIO (Union). However, the Board declined to award damages to the Union and members of the bargaining unit for benefits they allegedly lost as a result of the refusal of the Company to bargain as ordered by the Board. We grant enforcement of the Board's order in part and deny enforcement in part.
 
 
 2
 The Company is an employer engaged in commerce as defined by the Act and operates a printing plant in St. Louis, Missouri. All dates pertinent to this opinion are in 1969, unless otherwise indicated. Late in 1968 and early in 1969 the Union started its organization campaign among the employees of the Company, and by April 9 had secured ten authorized signature cards. On May 2, the Union Vice-President (Mr. Mantei) wrote and delivered a letter to Herbert M. Sayers (Sayers, Jr.), President of the Company, advising him that a majority of the offset and letterpress employees of the Company had authorized the Union to represent them, requesting the Company to recognize the Union as the exclusive bargaining agent for those employees, and further requesting the Company to begin negotiations for an agreement. A recognition agreement was enclosed. Sayers, Jr., through a secretary, refused to accept the tendered letter and agreement and had them returned to Mantei without seeing him.
 
 
 3
 Mr. Mantei then went to the Board's regional office, displayed the ten cards and filed a petition for a representation election. Pursuant to a stipulation, an election was held on June 13 with 21 persons voting. Of these, 8 voted in favor of the Union, 3 against, and 10 ballots were challenged. On June 19, the Union filed objections to conduct allegedly affecting the election result, and after an investigation by the Regional Office, the Regional Director recommended that certain challenges be overruled, one challenge be sustained, and others be referred for hearing. Both parties appealed these recommendations to the Board, and in its decision on November 3, it sustained the challenge to the ballot of Mylus Powell, thus reducing the eligible voters to 20. It then remanded the proceedings to the Director with instructions to open and count the ballots of Dale Hardy, M. Schmidt, Isringhaus, and Knudson. This was done, and the count then stood at 8 for the Union, 7 against, and 5 still challenged. Since no majority was evident, the Director entered an order consolidating the hearing on the five remaining challenges, with the hearing on the unfair labor practices alleged by the Union.
 
 
 4
 The five remaining votes were those of Al Polster, challenged by the Company, and Robert E. Evans, David E. Schutz, John A. Maxwell, and Earl Hardy, who were challenged by the Union. The Trial Examiner found that Polster had been illegally discharged prior to the election and should have been permitted to vote. The Union's challenges to the ballots of Evans and Schutz were not sustained; but its challenges to the ballots of Maxwell and Earl Hardy were sustained on the ground that they were supervisors within the meaning of Sec. 2(11) of the Act (29 U.S.C. Sec. 152(11)) and therefore excluded from the bargaining unit. Because of the determination by the Board that a bargaining order should issue, the three eligible votes were not then opened and counted. However, considering the fact that Polster had signed an authorization card and Evans and Schutz had not, and assuming the party challenging the votes had reason to do so, the vote apparently would have been 9-9, without Maxwell and Hardy, and 9 for the Union and 11 against, if Maxwell and Hardy had been determined to be members of the bargaining unit. Since the votes of all of the 10 persons who signed cards prior to the election (except the vote of Polster) were counted, it is obvious that at least one person who signed a card voted against the Union.
 
 
 5
 Polster was discharged on June 9 after being accused of being away from his press unnecessarily while it was running. Carlos Busackino and Thomas Carney were discharged on August 11 when the Company sold one of its presses and either terminated or severely curtailed the work of its letterpress department. The Examiner found and the Board held that these discharges were the result of the Union activity of these men and therefore were violations of Sec. 8(a) (3). The Board ordered them to be offered reinstatement and reimbursed for loss of pay they may have suffered as a result of the alleged discrimination practiced against them.
 
 
 6
 The Examiner and the Board found that prior to the election the Company engaged in acts calculated to coerce and threaten the members of the bargaining unit in their vote, and further found it to have made promises of enhanced economic benefits if the employees voted against the Union. These acts, together with the discharges, were found to be unfair labor practices. The Board also held that as of May 2, the Union represented a majority of the Company's employees within an appropriate bargaining unit, and that by refusing to recognize and bargain with the Union, the Company had engaged in an unfair labor practice within the meaning of Sec. 8(a) (5) of the Act. The Board ordered the Company to bargain with the Union and post the usual notices. The Company's refusal to comply with the Board's orders was followed by an application for enforcement in this Court by the Board. A petition for review was also filed by the Union as to that portion of the Board's order refusing to make whole the employees and the Union from the alleged damages by the Company's "unlawful refusal to recognize and bargain with it."
 
 
 7
 I. WERE MAXWELL AND HARDY SUPERVISORS?
 
 
 8
 We turn first to the question of whether or not there is substantial evidence in the record to justify the Board's findings that Maxwell and Hardy were supervisors, since that determination affects both the scope of the Sec. 8(a) (1) violations and also the question of whether or not a bargaining order should have issued.
 
 29 U.S.C. Sec. 152(11) provides as follows:
 
 9
 "The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."
 
 
 10
 This section of the statute, worded as it is in the disjunctive, has been consistently interpreted to mean that if any one of the enumerated indicia of supervision is present in a form which requires the exercise of independent judgment, there must be a finding that an employee so empowered is a supervisor and therefore excluded from the bargaining unit. N.L.R.B. v. Little Rock Downtowner, Inc., 414 F.2d 1084, 1089 (8th Cir. 1969); Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432, 434 (8th Cir. 1965), cert. denied, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966).
 
 
 11
 We have carefully examined the testimony of all the witnesses and have determined that there is no evidence that either Maxwell or Hardy could effectively recommend or that they attempted to exercise any independent judgment in management decisions to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline other employees or adjust their grievances. Evidence was offered which was calculated to show that Maxwell and Hardy did "assign" and "responsibly direct" other employees, but for reasons hereinafter set forth, we feel that this evidence is neither conclusive nor substantial and is not a sufficient basis for determining that Maxwell and Hardy were supervisors under the Act.
 
 
 12
 Both Maxwell and Hardy were hourly paid employees who had been with the Company a long time. They both had been assigned duties relating to quality control of the work, and on occasion, both ordered supplies.
 
 
 13
 Maxwell used a desk in an office occupied by plant superintendent Schmidt and assumed Schmidt's duties when he was on vacation. The "desk" used by Maxwell in Schmidt's office was used to lay out work not only by Maxwell but by other nonsupervisory employees. Maxwell attended daily meetings relating to scheduling the work; he did not make decisions on the scheduling, but he helped carry out those made by Schmidt and other members of management, including Sayers, Jr. and the Executive Vice President, Alexander E. Evans (Evans). Some employees testified that several years before, they had seen business cards showing Maxwell to be an "Assistant Superintendent", and magazines bearing that title had been received by Maxwell at the plant. And some employees said they were told Maxwell was their "immediate supervisor." Maxwell occasionally assigned employees to perform jobs, including painting and mowing the lawn, but the evidence shows that this was merely carrying out decisions made by Schmidt, Sayers, Jr., and Evans.
 
 
 14
 Hardy sometimes directed pressmen to clean their machines when they had no printing work to do and at other times directed them to mow the lawn or paint the building. On infrequent occasions he assigned overtime. It is clear, however, that these directions merely carried out directions or policies of Schmidt, Sayers, Jr., or Evans, and were not the result of the use of independent judgment by Hardy. At one time, Hardy ordered a pressman to cover a printing job with plastic; when he refused, Hardy took the employee to Evans who said Hardy was a "foreman" and told the employee to obey the order. Like Maxwell, Hardy attended daily scheduling meetings, made suggestions but not decisions as such, and helped carry out the scheduling decisions reached at those meetings. He also operated a press occasionally and did maintenance work, including occasionally painting and mowing with the others.
 
 
 15
 The case of N.L.R.B. v. Little Rock Downtowner, Inc., supra, concerned an employee who "was responsible for physical maintenance of the entire motel, hired painters on a contract basis, negotiated the cost to the company, directed the progress of the work, decided what rooms were to be painted, and exercised discretion in purchasing supplies." However, because the employee could not hire painters without authorization of the motel innkeeper, and the innkeeper made the payments to the painters and determined how the rooms would be painted, this Court upheld the determination by the NLRB that such an employee was not a supervisor. The evidence in that case was certainly stronger in showing supervisory status than the instant case. On the other hand in the Matthews case, supra, this Court upheld the determination by the NLRB that factory "leadmen" were supervisors. However, in that case, these "leadmen" could transfer employees from job to job as necessary, in their sole opinion, and could effectively recommend discipline, two factors not present in this case.
 
 
 16
 The fact that Maxwell and Hardy were paid more than other members of the unit is of no legal significance. The testimony concerning the meetings attended by these men showed clearly that their purpose for being there was to assist in carrying out the scheduling which was determined by Schmidt, Sayers, Jr., and Evans. While Maxwell replaced Schmidt as supervisor when Schmidt was on vacation, an employee does not acquire a supervisor's status by reason of temporarily taking over the duties of an absent supervisor. See Stewart & Stevenson Services, Inc., 164 N.L.R.B. No. 100, 65 L.R.R.M. 1314, 1317 (1967); Webb Fuel Co., 135 N.L.R.B. No. 30, 49 L.R.R.M. 1484, 1486 (1962); Frederick Steel Company, 149 N.L.R.B. No. 1, 57 L.R.R.M. 1285 (1964). See also Pulley v. N.L.R.B., 395 F.2d 870 (6th Cir. 1968). The employee's challenge to Hardy's authority to give an order related solely to quality control and had to be settled by Evans. This is some indication that the other employees did not regard Hardy as a supervisor. The old printed cards and magazines showing Maxwell as Assistant Superintendent are not conclusive as to what his duties are; a worker's supervisory status must be determined by his actual duties, not by his title. See N.L.R.B. v. Quincy Steel Casting Co., 200 F.2d 293, 296 (1st Cir. 1952); Red Star Express Lines v. N.L.R.B., 196 F.2d 78, 80 (2d Cir. 1952); F. W. Woolworth Co., 188 N.L.R.B. No. 119, 77 L.R.R.M. 1095 (1971); Marinette Marine Corp., 179 N.L.R.B. No. 102, 72 L.R.R.M. 1449 (1969). It is clear that Sayers, Jr., Evans, and Schmidt made most of the decisions and communicated them to the employees either directly or through Maxwell and Hardy.
 
 
 17
 Although the Board has the primary function of determining factual issues such as this, that determination must be supported by substantial evidence and have a reasonable basis in law. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951), stated the rule as follows:
 
 
 18
 "Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."
 
 
 19
 Our examination of the record in this case convinces us that the evidence supporting the Board decision that Maxwell and Hardy were supervisors is not "substantial" when viewed in the light that the entire record furnishes, including the evidence opposed to the Board's view, and this portion of the Board's findings should not be allowed to stand.
 
 
 20
 II. DISCHARGES OF POLSTER, BUSACKINO, AND CARNEY
 
 
 21
 Polster was the first employee to sign up with the Union and was elected to be the shop steward. He acknowledged that he was one of the leaders of the campaign to unionize the shop, and management was aware of his activities.
 
 
 22
 In late May or early June, management became concerned about production and instituted a shop rule to the effect that employees must remain at their press while the press was running. This did not apply to absence due to an employee going to a restroom, but was intended to discourage visiting among the employees. Polster on one occasion was talking to Charles G. Brown (Brown), another employee, and was warned by Sayers, Jr. that he was not allowed to leave the press, and he was not allowed to campaign. About a week later a similar warning was given to Polster by Sayers, Jr. at a time when the press was broken down.
 
 
 23
 On June 9, four days before the election, Polster went to the bathroom and on the way back to his press stopped and talked to Brown at Brown's request for a period of time from thirty seconds to two or three minutes. (Brown testified it was about thirty seconds, and Richard D. Thomas (Thomas), a Vice President of the Company, testified that it was two or three minutes.) Thomas testified he immediately fired Polster for violating the rule a third time. Polster testified Thomas warned him again, told him to go back to his press, and that a few minutes thereafter he was fired by Sayers, Jr.
 
 
 24
 We have studied all of the testimony, and we must conclude that in view of the history of the organizational campaign to that date, there is substantial evidence in the record to support the Examiner's determination that Polster's union activity rather than his temporary absence from the press was the real reason for his being fired. Accordingly, that portion of the Board's order relating to Polster's discharge will be enforced.
 
 
 25
 Both Busackino and Carney worked in the letterpress department, and both had executed authorization cards for the Union. Carney testified that prior to the election he was advised by the plant superintendent, Mr. Schmidt, that if the Union won, the Company would probably do away with the letterpress department. On crossexamination, Carney conceded that letterpress work had been declining in favor of offset work during the three years he had worked with the Company, and that the tendency of the industry and the Company was to phase out letterpress.
 
 
 26
 Carney and Busackino were discharged on August 11, the same day that the Heidelberg press that Busackino worked on was sold and removed from the premises. This left only one press in the letterpress department. Work had been slack in that department, and Carney and Busackino were advised that they were good craftsmen and "if ever they got busy again, they would call us back."
 
 
 27
 When management decided to reduce their letterpress operators from three to one, the labor relations counsel for the Company was consulted, and it was determined to make the decision on the basis of company-wide seniority among the employees engaged in the letterpress department. The Examiner was skeptical of the basis claimed for the decision, and he pointed out that if straight plant-wide seniority had been used, Evans and Busackino would have been discharged, while if straight letterpress department seniority had been used, Busackino and Schutz would have been discharged. (Using any of the three possible bases, Busackino would have lost his job.) We do not believe that substantial evidence supports the determination of the Board that either of these employees were discharged because of union activity rather than the reason given by the Company. We decline to enforce that portion of the Board's order.
 
 III. SECTION 8(a) (1) VIOLATIONS
 
 28
 The Examiner found that the Company engaged in unfair labor practices within the meaning of Sec. 8(a) (1) of the Act by
 
 
 29
 "coercively interrogating employees concerning their union activities and the union activities of their fellow employees; threatening employees that the plant would be closed and moved to another location if the employees selected the Union as their representative; threatening employees with loss of employment during slack periods in the event they voted for the Union; threatening employees with loss of production bonuses and other benefits if they chose the Union in the election; threatening employees with discharge in the event of a union victory; creating the impression of surveillance of its employees' union activities; threatening to eliminate the letterpress department in the event of unionization; threatening to discharge employees under color of a rule which was devised and applied solely to restrain and coerce employees in the exercise of rights under Section 7 of the Act; coercively interrogating employees as to how they voted in the election; and, in promising employees enhanced economic benefits if they voted against the Union."
 
 
 30
 To the extent that the Examiner found these violations to be the result of the actions of Maxwell and Hardy in making implied threats of loss of employment, loss of production bonuses, and discharge, the Board's findings are obviously incorrect since we have heretofore held that Maxwell and Hardy were members of the bargaining unit and not supervisors. Thus, because the record is void of any evidence that would show Maxwell and Hardy acted at the request or direction of management, the Company is not charged with responsibility for their actions during the election campaign.
 
 
 31
 It would serve no useful purpose at this stage to analyze these findings one by one to demonstrate which ones are supported by the evidence. It is sufficient to say that there is substantial evidence to support the findings that: (1) some employees were coercively interrogated by management concerning their union activities; (2) there was an implied threat to close down the plant if the Union won and move to another location; (3) there was some surveillance of the employees' union activities; and (4) the letter sent by Sayers, Sr., as well as his speech to the employees, contained phrases which could be interpreted as veiled promises of increased benefits if the employees voted against the Union.
 
 
 32
 The rule concerning remaining at the press while it was running was not, in our opinion, shown to be devised solely to threaten, restrain or coerce employees in the exercise of their rights under the Act, but was applied in a coercive manner to Polster. The record does not support the finding that employees were coercively interrogated as to how they voted in the election.[1]
 
 
 33
 The four findings of the Trial Examiner which were supported by substantial evidence as set forth above, warrant the finding of Sec. 8(a) (1) violations, and the portion of the Board's order relating to those four findings will be enforced except as they were used as a basis for the issuance of the bargaining order.
 
 IV. THE BARGAINING ORDER
 
 34
 The bargaining order issued by the Board was based partially upon its determination that on May 2, 1969, the Union represented a majority of the employees in the bargaining unit. This in turn was premised on the finding that Maxwell and Hardy were supervisors, leaving only 18 in the bargaining unit of which 10 had signed cards. As we have heretofore shown, the bargaining unit actually contained 20 members, including Maxwell and Hardy, and therefore the Union did not demonstrate that it ever had a majority of the unit as members.
 
 
 35
 The Supreme Court in N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969), stated as follows:
 
 
 36
 "The only effect of our holding here is to approve the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes. The Board's authority to issue such an order on a lesser showing of employer misconduct is appropriate, we should reemphasize, where there is also a showing that at one point the union had a majority; in such a case, of course, effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior."
 
 
 37
 In N.L.R.B. v. Dixisteel Buildings, Inc., 445 F.2d 1260, 1265 (8th Cir. 1971), Judge Bright spoke for this Court in upholding a bargaining order in these words:
 
 
 38
 "In order to justify a bargaining order in the situation where the employer's unfair practices have not been egregious, the record need show that the Union held a majority at one point, not that the Union held a majority according to signed cards up to the time of the election."
 
 
 39
 In our opinion, some of the actions of the Company in this case were erroneous and illegal as heretofore set forth, but they were not egregious to the extent that a bargaining order should be enforced in the absence of a showing that the Union once had cards from a majority of the employees. That portion of the Board's order will not be enforced. The appropriate remedy, as originally urged in the alternative by the General Counsel to the Examiner, was to open and count the votes of Polster, Evans, and Schutz, and in the event the Union did not receive a majority, the election could be set aside and new balloting take place.
 
 V. MAKE WHOLE REMEDY
 
 40
 The Union urged the Board to require the Company to "make whole" the employees and the Union for benefits of collective bargaining they lost as a result of the Company's refusal to bargain with the Union. The Board declined on the basis that it lacks the statutory authority to grant such a remedy.
 
 
 41
 In view of our holding that the bargaining order issued by the Board was inappropriate in this case, it logically follows that the suggested make-whole remedy is inappropriate, and we express no opinion as to the Board's authority to grant such a request in an appropriate case.
 
 VI. CONCLUSION
 
 42
 The Board's order is enforced as to parts 1(a), 1(b), 1(f), 1(j), 1(k), 1(m), 2(d), and 2(f). As to Polster only, we also enforce 2(a) and 2(b). The notice referred to in 2(e) shall be amended to conform to the views expressed in this opinion and then posted as set forth in 2(e). We decline to enforce the balance of the Board's order. The Board shall make a new determination as to whether or not to order another election as a consequence of the Sec. 8(a) (1) and Sec. 8(a) (3) violations.
 
 
 
 [1]
 Polster voted subject to the challenge of the Company even though he had been discharged four days earlier. Sayers, Jr. facetiously asked him how he voted, and Polster replied he had voted for the Union. Characterizing this as coercive interrogation is absurd