**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SPEED QUEEN, a division of McGraw-Edison Co., Respondent.**

No. 72–1092.

United States Court of Appeals,
Eighth Circuit.

Submitted Oct. 19, 1972.

Decided Nov. 16, 1972.

As Amended on Denial of Rehearing
and Rehearing En Banc
Dec. 21, 1972.

Corinna Lothar Metcalf, Atty., N. L. R. B., Washington, D. C., for petitioner.

James W. Moore, Little Rock, Ark., for respondent.

Before LARAMORE, United States Court of Claims Senior Judge and BRIGHT and ROSS, Circuit Judges.

ROSS, Circuit Judge.

The National Labor Relations Board (Board), adopting the trial examiner's findings, determined that Speed Queen (Company) had committed unfair labor practices in violation of §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act. (29 U.S.C. §§ 158(a)(1) and 158(a)(3).)[1] The Board issued an order requiring the Company to cease and desist from action hereinafter described which it deemed threatening and coercive and to reinstate and make whole an employee found to have been unlawfully discharged. We grant enforcement in part and deny enforcement in part.

The Company is engaged in the manufacture of washers and dryers at its plant in Searcy, Arkansas. Prior to locating in Searcy, the Company operated a temporary facility at Judsonia, Arkan-

1. The Board found that the Company's showing of the film "And Women Must Weep" was in violation of § 8(a)(1). However, in light of this Court's rulings in Kellwood Co. v. N.L.R.B., 434 F.2d 1069, 1072 (8th Cir. 1970), cert. denied, 401 U.S. 1009, 91 S.Ct. 1257, 28 L.Ed. 2d 544 (1971), and N.L.R.B. v. Hawthorn Co., 404 F.2d 1205, 1215 (8th Cir. 1969), the Board does not seek enforcement of that part of its order.

sas. In October or November of 1969, Reeves, a representative of the United Steelworkers of America (Union), recruited employee Nixon for participation in a union campaign to begin when the plant would be moved to the Searcy location. Nixon in turn recruited employees Heathscott and Cook to help in the organizing campaign. The Company moved from Judsonia to Searcy in January, 1970, and production began in March. The first union meeting was not conducted until June 25, and the first handbilling of the plant did not occur until August 12.

### Surveillance

In January, 1970, after moving to the Searcy plant, Hines, a plant supervisor, asked Nixon and Heathscott how they were coming along with their union campaign. When they said all right, he laughed and said that they were aware of all the contacts Nixon and Heathscott had had in Judsonia. Furthermore, Hines told several employees the time and place of the union meeting on June 25. Hines was not called to testify by the General Counsel, and there is some evidence that he was sympathetic to unionization. Regardless, the trial examiner expressly refused to draw an inference from the General Counsel's failure to call Hines, and he found that these conversations created an unmistakable impression of surveillance in violation of 8(a)(1). There is substantial evidence in the record to support this finding.

At the time of the union meeting on June 25, Springstroh, the plant manager, was observed parked in a rented automobile in a supermarket lot adjacent to the Holiday Inn in Searcy and watching the room where the meeting was taking place. Twice, when Nixon approached the automobile, Springstroh moved to another spot in the parking lot. Springstroh testified that he did not know about the union activity; that he simply happened to be shopping at the store next to the Holiday Inn when the curiosity of seeing approximately eighteen employees' automobiles prompted him to find out what was going on. The trial examiner chose not to credit this testimony and found that Springstroh's conduct constituted overt surveillance, again in violation of 8(a)(1). It is settled law that questions of credibility are primarily matters for the Board's determination. N.L.R.B. v. Penzel Construction Co., 449 F.2d 148, 149 (8th Cir. 1971); N.L.R.B. v. Ralph Printing and Lithographing Co., 379 F.2d 687, 690 (8th Cir. 1967). And upon a complete review of the record, which reveals Company hostility toward unionization, we conclude that the Board's finding is supported by substantial evidence. See N.L.R.B. v. Comfort, Inc., 365 F.2d 867, 870–871 (8th Cir. 1966).

### Interrogation and Threats

Several employees testified that when they were hired Springstroh conducted an orientation program, at which time he told them that the Company did not want a union and that there was no good reason to have one. He also displayed to the employees an architect's rendering of the plant under construction in Searcy, and indicated that things would have to go well before there could be an expansion of the plant. The trial examiner credited Springstroh with stating that expansion would depend partially upon whether the plant was organized or not, although Springstroh denied this statement. One employee testified that Springstroh stated he would do anything within the law to keep the plant from going union.

Nixon testified that when he was interviewed prior to being hired, Springstroh asked him if he had ever had a union job, and asked him whether he would cross a picket line. He testified further that after being hired, at orientation, Springstroh told him that he had been informed there would be attempts to organize, and he asked that employees inform him of any contacts with any union representatives.

■ The Board found that Springstroh's statements were more than expression of views; that, coupled with other unfair labor practices, they constituted threats and interrogation in violation of 8(a)(1). We find adequate support in the record for that finding. *See* N.L.R.B. v. Sayers Printing Co., 453 F. 2d 810, 817 (8th Cir. 1971).

Supervisor Hines questioned various employees about their conversations with the union representative, and asked one employee to let him know whenever they were going to have a meeting. The Company attempts to characterize Hines' inquiries as noncoercive because of his "obvious union sympathies." It was Hines who notified the employees about the initial organizational meeting and encouraged them to attend. He also indicated a personal preference for the Steelworkers Union. Moreover, the Company contends that the inquiries were noncoercive because there was no reluctance on the part of any of the employees to disclose facts to him. The conversations were always friendly, and sometimes jovial. Therefore, the Company argues, this "friendly relationship" dispelled the hostile atmosphere essential to coercive 8(a)(1) violations.

At the same time, however, the record discloses that employee Cook testified that, in early June, Hines asked him if he had been approached by the union representative. Cook admitted that he had, and Hines left. Approximately one-half hour later, Hines returned and asked Cook what the representative wanted. Hines then said that he would like to know whenever the employees were going to have a meeting, and he indicated that he was "against the union."

Around the middle of June, Hines informed Cook that he knew he was getting paid for each card he got. He stated that Springstroh had told him that Cook was asking for names and addresses of all of the employees, and warned that if he didn't stop this, he wouldn't be around long. He then began discussing job opportunities as a foreman or inspector.

■ In light of this testimony, and the frequency with which Hines' inquiries of various employees occurred, there appears to be substantial evidence to support the Board's findings that Hines interrogated employees, made a promise of benefit and threat of discharge, and created an unmistakable impression of surveillance (discussed above), all in violation of 8(a)(1). *See* Orchard Corp. of America v. N.L.R.B., 408 F.2d 341, 342 (8th Cir. 1969); N.L.R.B. v. Louisiana Manufacturing Co., 374 F.2d 696, 700 (8th Cir. 1967); N.L.R.B. v. Ritchie Manufacturing Co., 354 F.2d 90, 99 (8th Cir. 1965); Jas. H. Matthews & Co. v. N.L.R.B., 354 F.2d 432, 439–440 (8th Cir.), cert. denied, 384 U.S. 1002, 86 S. Ct. 1924, 16 L.Ed.2d 1015 (1965).

### *No-Solicitation Rule*

The Company's handbook, which is distributed to all new employees, contained a no-solicitation rule, which was illegal on its face. The Company does not dispute this; rather, it contends that because there was no evidence the rule was ever enforced, relying upon N. L.R.B. v. Shawnee Industries, Inc., 333 F.2d 221, 225 (10th Cir. 1964), and because the rule was subsequently changed and notice was posted on the employee bulletin board, there could have been no violation of the Act.

■■ Suffice it to say that it was reasonably foreseeable the invalid rule as interpreted by Springstroh would deter solicitation by the employees, and this is enough to constitute an unfair labor practice. *See* Jas. H. Matthews v. N.L.R.B., *supra*, 354 F.2d at 440–441. This evidence shows that Springstroh made it clear to new employees that he would tolerate "nobody in the plant to disturb anybody about getting something signed, like the union, or even if it was for a baseball team, or donations, or assembly."

The revised no-solicitation rule was posted after the filing of the complaint

in this case, and it has since been revised in the handbook. But because the Board found the old rule to have interfered with, restrained and coerced the employees in the exercise of their § 7 rights, it found there to be a violation of 8(a)(1). This finding is also supported by substantial evidence.

### Discharge

On June 18, 1970, employee Nixon was suspended, ostensibly for disregarding a company safety rule requiring that he wear safety glasses while operating his turret lathe or under other hazardous conditions. His discharge the following day was the only discharge the Company had made for a safety violation. The Regional Director for the Board refused to issue a complaint with regard to the discharge, because his investigation "disclosed that Billy Wayne Nixon . . . was discharged for repeated violations of a company safety rule requiring the wearing of safety glasses." The trial examiner and the Board, however, determined that the Company was motivated by Nixon's union activity, and therefore found there to be a violation of 8(a)(3) and (1).

Nixon began operating the turret lathe on March 16. The turret lathe is used to cut a gear part, which is turning on a spindle. Metal chips that have been turned off the gear will occasionally fly off. Consequently, safety glasses are required by a rule in the employee's handbook. Violation of that rule is grounds for suspension or discharge.

Although the Company received a shipment of safety glasses on March 19, and Roberson, Nixon's supervisor, claims that he supplied Nixon with glasses within a week after he went on the machine, the trial examiner fixed April 29, or thereabouts, as the date Nixon received his glasses. This finding was based upon the testimony of another employee who testified that he received his glasses on the 29th. Nixon testified that he did not receive his glasses until sometime between May 1 and May 15. At any rate, Nixon had been furnished the glasses over six weeks prior to being discharged.

There is testimony that Springstroh frequently reminded employees to wear their safety glasses. He claims that he verbally reminded Nixon on at least ten occasions. And in Nixon's file were notations that he was warned on June 3 and June 8 to put his safety glasses on. Because Nixon was not provided a copy of these "written warnings" the General Counsel implies they were not made. However, Springstroh explained that the notations were made in the file simply to serve as a reminder, for future reference, that Nixon had been warned. Only one other employee's file contained such a warning during the period in question. Roberson likewise testified that he had reminded Nixon on several occasions. Nixon testified that he had never been warned about not wearing his glasses but admitted reading the rules requiring the wearing of the glasses.

On the day of the suspension, Springstroh testified that he was taking a group of new employees on a tour through the plant when he noticed that Nixon was not wearing his glasses. He noticed at the same time that the machine was running, and the spindle was turning. He called Roberson over and they both went to Nixon's station, at which time he suspended Nixon.

Roberson testified that as he and Springstroh walked toward Nixon, he saw Nixon pick his glasses up off the spot facing machine behind him and start wiping them off. Nixon, on the other hand, testified that his glasses had dropped from his pocket into the machine reservoir, and he had just retrieved them and was cleaning them when Springstroh approached.

Nixon testified that he tried to explain that he was in the process of adjusting the machine, and that a gear was not being turned, but that Springstroh would not listen to him. He also testified that Roberson knew Nixon was not operating the machine and that he

said he would talk to Springstroh. Roberson, however, testified that he did not have this conversation.

The Board credited Nixon's testimony that he was not operating the machine, and thus by implication that the safety rule did not apply. There is ample evidence, however, that the spindle was turning on the machine, and it therefore presented a dangerous condition. In any case, there appears in the record a basis for a determination that Springstroh was justified in feeling there was a safety violation.

The Board also found, contrary to Springstroh's testimony, that he was aware of Nixon's union activity prior to the June 18 suspension and consequent discharge. This finding is supported by substantial evidence in the record. It is also apparent from Springstroh's other unlawful actions that he exhibited strong antiunion animus. But knowledge of union activity, and an antiunion attitude, does not necessarily lead to the conclusion that a discharge is pretextual.

"[W]here a proper motive for the discharge can as reasonably be inferred as an improper motive, the discharge should not be set aside by the Board where the more substantial evidence supports the proper motive." DC International, Inc. v. N.L.R.B., 385 F.2d 215, 220 (8th Cir. 1967); N.L.R.B. v. Ace Comb Co., 342 F.2d 841, 847 (8th Cir. 1965).

We find there to be no substantial evidence to support the Board's finding that the discharge was pretextual. To the contrary, the overwhelming direct evidence supports the proper motive alleged by Springstroh.

There is also evidence that Nixon had little regard for his job. Two fellow employees testified that Nixon had told them, on separate occasions, that he wished the Company would fire him, because if he quit his wife would "raise holy hell." In reply to one of these employees who told him that if he didn't quit horsing around he would get fired, Nixon said that was what he wanted.

He said that if he would be fired he would just go to the Union and the Board and "get every dime I have got coming easy." He told the other employee that he was trying to get a job with the civil service. In fact, he took the civil service examination prior to his discharge and later accepted employment by the post office department.

We cannot say that in light of all this direct testimony, together with the testimony that Nixon wanted to be fired, and the lack of direct evidence that he was fired for his union activity, that there is sufficient evidence to support the finding that his discharge was motivated by his union activity in violation of 8(a)(3) and (1). We therefore refuse to enforce that portion of the Board's order.

### Conclusion

The Board's order is enforced except for parts 1(a) and 2(a), (b) and (c), which are not based upon substantial evidence, and that portion of 1(c) relating to the film "And Women Must Weep," for which the Board did not seek enforcement.