**TIPTON ELECTRIC COMPANY and Professional Furniture Company, Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Retail Clerks Local 655, a/w UFCW, AFL-CIO, Intervenor-Respondent.**

No. 79–1387.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 11, 1980.

Decided April 14, 1980.

Rehearing and Rehearing En Banc Denied May 19, 1980.

---

Lewis C. Green, Green, Hennings & Henry, St. Louis, Mo., argued, and Richard D. Lageson, St. Louis, Mo., on brief, for petitioners.

Barbara Kraft, Atty., N. L. R. B., Washington, D. C., argued, Andrew F. Tranovich, Atty., Washington, D. C., Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., on brief, for respondent.

Before GIBSON, Senior Circuit Judge, and HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

This matter is before the Court upon the petition of Tipton Electric Company and Professional Furniture Company to review a May 14, 1979, decision and order of the National Labor Relations Board. The Board has filed a cross-application for enforcement of its order. The Board found that the employers had violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151, *et seq.* It also found that the Retail Clerks Union Local 655 had secured signed authorization cards from twenty-three employees and that these employees constituted a majority of an appropriate unit consisting of forty-four employees. It concluded that the unfair labor practices were sufficiently serious to warrant setting aside an election conducted by the Board and to support the issuance of a bargaining order. It entered an order requiring the employers to cease and desist from the unfair labor practices found and requiring the employers to bargain with the Union and to post appropriate notices. We hold that there is substantial evidence on the record as a whole to support the Board's findings and that the Board's remedy, including a bargaining order, was proper under the circumstances. *See Tipton Electric Co. v. N.L.R.B.,* 242 N.L.R.B. 36, 101 L.R.R.M. 1154 (1979).

There is without a doubt substantial evidence on the record as a whole to support the Board's findings that the employers violated § 8(a)(1) of the Act by threatening employees that they would lose their right to deal directly with management if the Union won an election,[1] *see*

---

1. We find no merit to the employers' contention that the statements of Michael Krieg were not binding on the employees. The Board found that "although Krieg's authority to independently affect the employment status of employees was limited, he at all material times responsibly directed sales employees in more than routine fashion, and that, in performing

*N.L.R.B. v. Graber Mfg. Co.*, 382 F.2d 990 (7th Cir. 1967); by creating the impression of surveillance of Union activity,[2] *see N.L.R.B. v. Speed Queen*, 469 F.2d 189 (8th Cir. 1972); by refusing to transfer an employee because of his Union activities; by promising employees a new pay policy shortly before the election, *see Royal Typewriter Co. v. N.L.R.B.*, 533 F.2d 1030 (8th Cir. 1976); and by implementing that policy immediately after the Union lost the election, while election objections were pending, in order to reward employees for voting against the Union and to influence their votes in any return election, *see N.L.R.B. v. Exchange Parts Co.*, 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). It is also clear that the Board had no option in the light of these findings but to set aside the election, to enter a cease and desist order and to require that appropriate notices be posted.

What is open to question is whether the Board was justified in entering a bargaining order. The answer to this question turns on the answers to four subsidiary inquiries: (1) is the unit designated by the Board an appropriate one; (2) did the Board properly exclude two employees, Diane Smith and Mary Brown, from the bargaining unit; (3) were the authorization cards of Janice Harris, Sharon Summers, Katie Snyder, Shai Farber and Paul Devino validly executed; and (4) were the companies' unfair labor practices of such a nature as to justify the Board issuing a bargaining order? We turn to a consideration of these issues.

## I. *The appropriate unit.*

The Board found that a unit consisting of all full-time and regular part-time selling employees employed by the Tipton Electric Company and the Professional Furniture Company at their facilities in the St. Louis area was appropriate. The finding that a joint employer unit was appropriate was based on the fact that the employers stipulated to their status as joint employers for the purpose of securing a consent election. The Board held that they were bound by that stipulation in this unfair labor practice case.

The employers argue that they should not be bound by the stipulation and that the unit is inappropriate. We disagree. The Board's holding that the stipulation was binding is correct. Generally, once an issue has been fully litigated in a representation proceeding, it cannot be relitigated in an unfair labor practice proceeding. *Magnesium Casting Co. v. N.L.R.B.*, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735 (1971); *Pittsburgh Plate Glass Co. v. N.L.R.B.*, 313 U.S. 146, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); *N.L.R.B. v. Commercial Letter, Inc.*, 455 F.2d 109, 133 (8th Cir. 1972). In our view, the Board may give the same effect to a stipulation as it gives to a litigated determination. Alternatively, the Board has wide discretion in determining bargaining units. *See N.L.R.B. v. Target Stores, Inc.*, 547 F.2d 421 (8th Cir. 1977). It did not abuse that discretion by holding that Tipton and Professional were joint employers. Although the two companies are separate corporations, they are closely related. They have some common ownership: Professional leased space from Tipton at several of its retail stores, the president of Tipton is one of Professional's board of directors and the executive vice president of Tipton is president of Professional and a member of its board of directors.

## II. *Exclusion of Diane Smith and Mary Brown from the bargaining unit.*

The Union obtained authorization cards from twenty-three employees. If em-

---

this function, he exercised independent judgment sufficient to bring him within the statutory definition of supervisor." (Footnote omitted.) This finding is supported by substantial evidence on the record as a whole.

**2.** We find no merit to the employers' contention that the surveillance violations must be dismissed because they were not alleged in the complaint. The complaint did allege unlawful surveillance and circumstances of the specific incidents that were found to be violative of the Act were fairly tried by the parties. *See McGraw-Edison Company v. N. L. R. B.*, 419 F.2d 67 (8th Cir. 1969).

ployees Diane Smith and Mary Brown were properly excluded from the unit, the unit consisted of forty-four employees and the Union had authorization cards from a majority of the unit employees. If they were not properly excluded, the unit consisted of forty-six employees and the Union had not secured authorization cards from a majority of the unit employees. There was substantial evidence on the record as a whole to support the Board's finding that both women should be excluded. Diane Smith was not supervised by the same personnel who supervised the other sales people, she spent about forty percent of her time in clerical work, she was paid by the hour rather than by a draw against commission and her work as a sales person was largely as a replacement. Mary Brown spent only ten to fifteen percent of her time selling merchandise and her sales were to special customers referred to her by supervisory personnel or to her own personal acquaintances or relatives. She spent most of the remainder of her time assisting the merchandise manager. She, too, was paid a salary rather than a draw against commission and had contact with regular sales persons only when she was called to obtain special items not in inventory and for information on delivery of such items. She did not cover for absent and vacationing sales persons.

Under the circumstances recited above, we believe that the Board's determination that Smith and Brown did not share the requisite community of interest with selling personnel to warrant their inclusion in the unit was reasonable. *See Pittsburgh Plate Glass Co. v. N. L. R. B., supra; N.L.R.B. v. Target Stores, Inc., supra; N.L.R.B. v. Crystal Tire Co.,* 410 F.2d 916 (8th Cir. 1969).

III. *The validity of the authorization cards of Janice Harris, Sharon Summers, Katie Snyder, Shai Farber and Paul Devino.*

■ In September, 1976, the Union mailed cards to the employees of Tipton and

Professional. The cards were single-purpose cards in the following form:

RETAIL STORE EMPLOYEES UNION LOCAL
NUMBER 655—AFL–CIO AUTHORIZA-
TION FOR REPRESENTATION

Union's address            Union's Telephone number
                                   Date _____
Name _____ Home Phone _____
Address _____
            (Street)     (Zone)     (City)     (State)
Employed by: Company _____ Store No. _____
Store Address _____
Job title _____ (Full-time)—(Part-time)
Department _____ Weekly Salary _____
My day off is _____ Date of Employment _____

I, the undersigned, of my own free will, authorize the above named union, their agents or representatives to act for me as a collective bargaining agency in all matters pertaining to pay rates, hours of employment and other conditions of employment.

(Signature) _____
—THIS CARD IS KEPT STRICTLY CONFIDENTIAL—

The cards were accompanied by a letter which read in part as follows:

Enclosed, you will find two authorization cards to be used by yourself and a co-worker who is also interested. Local 655 must have at least 51% of the employees employed at Tipton sign one of the cards to attain union representation. Remember three important things when signing this card:

1. You are not joining a union, by signing the card.

2. You cannot be fired by signing the card.

3. You are *only* allowing Local 655 to attempt to negotiate a contract, which you will vote on! [Emphasis included.]

Harris signed an authorization card on September 16, Snyder signed a card on October 12, Farber and Devino signed cards on November 7, and Summers signed a card on November 8. The Board found that all of the cards were valid. The employers argue vigorously that this finding is in error as to each of the employees listed above, principally[3] because their signatures were obtain-

---

**3.** The employers also contend that several other cards were stale. We find no merit to this contention. The elapsed time from the date the

first card was signed in September, 1976, until the petition that resulted in an election, was

ed on the basis of representations that the cards would be used exclusively to obtain an election.

In *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court affirmed the Board's *Cumberland Shoe* doctrine,[4] and held that when an employee signs a single-purpose card stating clearly and unambiguously on its face that the signer designates a union as his or her representative, the signer is bound by the clear language of what he or she signs unless that language is deliberately and clearly cancelled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature. The Court quoted with approval the Board's application of the doctrine:

"Thus the fact that employees are told in the course of solicitation that an election is contemplated, or that a purpose of the card is to make an election possible, provides in our view *insufficient* basis in itself for vitiating unambiguously worded authorization cards on the theory of misrepresentation. A different situation is presented, of course, where union organizers solicit cards on the explicit or indirectly expressed representation that they will use such cards *only* for an election and subsequently seek to use them for a different purpose  .   .   . ."

The Board stated further in a footnote:

"The foregoing does not of course imply that a finding of misrepresentation is confined to situations where employees are expressly told in haec verba that the 'sole' or 'only' purpose of the cards is to obtain an election. The Board has never suggested such a mechanistic application of the foregoing principles, as some have contended. The Board looks to substance rather than to form. It is not the use or nonuse of certain key or 'magic' words that is controlling, but whether or not the totality of circumstances surrounding the card solicitation is such, as to add up to

an assurance to the card signer that his card will be used for no purpose other than to help get an election."

*Id.* at 608 n.27, 89 S.Ct. at 1936 (quoting *Levi Strauss & Co. v. N.L.R.B.*, 172 N.L. R.B. 57, 68 L.R.R.M. 1338, 1341, 1342 & n.7 (1968)) (emphasis included).

The Board, relying on *Gissel*, found the five cards in question to be valid. We agree with that finding. The cards were clearly single-purpose cards. They were not only entitled "Authorization for Representation" but they specifically authorized the Union to represent the signer as his or her collective bargaining agency. The accompanying letter also clearly specified that the purpose of the card was to allow the Union to "attempt to negotiate a contract which you will vote on."

The language on the cards was not deliberately and clearly cancelled by a Union adherent with words calculated to direct the signer to disregard and forget the language above his signature. Here, as in *Gissel*, the employees were told that if sufficient cards were signed, an election would be made possible but the totality of the circumstances surrounding the card solicitation was not such as to add up to an assurance to the signers that their cards would be used for no other purpose than to help get an election.

Harris was told that if she signed and returned the cards, she would get information and find out about the Union. She may also have been told by fellow employees who were Union adherents that signing the card did not commit her one way or another. What they may have meant by this statement, or what she may have understood by it, is not clear. Certainly, it cannot be said that the language was clearly and deliberately calculated to direct her to forget the language above her signature. Harris also testified that she filled in the card and signed it without reading either the card or the letter accompanying it. The

about five months—a long time. A request for recognition was made in November.

4.  *See N.L.R.B. v. Cumberland Shoe Corp.*, 144 N.L.R.B. 124, 54 L.R.R.M. 1233 (1963), *enforced*, 351 F.2d 917 (6th Cir. 1965).

Board discredited that testimony as incredible. We agree with that assessment but, even if she had not read the card or letter, that fact would not, standing alone, be dispositive of the question. It would still be necessary to find that the Union adherents used language calculated to direct her to forget the language above her signature, and this they did not do. *See Texaco, Inc. v. N.L.R.B.*, 436 F.2d 520 (7th Cir. 1971).

Snyder received a card and a letter in the mail. She, too, testified that she read neither when she received them. She signed a card in one of the employer's stores a few weeks after she received the initial card and letter in the mail. Snyder testified that she filled in all of the blanks on the card and signed it after a short conversation with a Union organizer who, she said

> handed me a card and * * * said "You can just sign it now." And I didn't give a second look to the card. The only thing I asked him was, "Does this card mean anything?" And he said, "No it's just for the election, that it doesn't mean you're for or against anything. It's just that we know that you are employed here since we have never ran into you in any of the stores before."

Robert Litteken, the Union organizer who solicited the card, described the solicitation differently:

> A. I just talked to her at her desk, discussed many facets of the Tipton Electric Company, the pros and cons of why she should have the union represent her, and eventually she signed a card for representation by Local 655.
>
> *    *    *    *    *    *
>
> JUDGE SCHWARZBART: What, if anything, was said about the card before she signed it?
>
> THE WITNESS: We talked about the whole part of union organizing and—
>
> JUDGE SCHWARZBART (interrupting): What did you say to her?

THE WITNESS: That the card could be used to gain recognition from the company for union representation.

JUDGE SCHWARZBART: What, if anything, was said about an election?

THE WITNESS: * * * [T]here was no mention made of an election.

*    *    *    *    *    *

JUDGE SCHWARZBART: What reference, if any, was made as to the number of employees who had signed cards?

THE WITNESS: There was no references made other than the fact that we needed a majority of the people to sign these cards in order to obtain recognition from the company.[5]

The Board credited the testimony of Litteken. We see no reasons to disturb this credibility finding. *See James H. Matthews & Co. v. N.L.R.B.*, 354 F.2d 432 (8th Cir.), *cert. denied*, 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015 (1966); *N.L.R.B. v. Morrison Cafeteria Co. of Little Rock, Inc.*, 311 F.2d 534 (8th Cir. 1963).

Farber and Devino both signed cards on November 7 after a rather lengthy Union meeting. Both had previously received cards in the store and in the mail and had read the cards. Both had also received and read the accompanying letter. Both conceded that the Union agents explained about the Union's purpose, how the Union would improve the employees' situation and why a union was needed. Both also testified, in substance, that they were told that signing the card didn't commit them to anything—that the cards were only to get an election.

Thomas Willey, a Union representative, specifically denied that either he or any other Union spokesman at the meeting had said the cards were only to get an election. Willey described the conversation during the meeting as follows:

---

5. In an earlier affidavit, Litteken is reported to have stated that he had told Snyder that "if we could get recognition we would attempt to get an NLRB election." The affidavit is not a part of the record. Even if such a statement had been made, it would not constitute grounds to invalidate the card under *N.L.R.B v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

A. [Farber] asked me that if the union got in and a contract was negotiated, would everybody have to join the union.

\*   \*   \*   \*   \*   \*

A. I told Mr. Farber that assuming that the union contract that was negotiated had a union security clause, yes, everyone would have to join the union that was in the appropriate unit.

Q. Do you recall him asking any other question?

A. No, after I responded to his question, he did make some comment that in the country he came from, that kind of a thing was considered undemocratic and it would not be allowed to happen.

\*   \*   \*   \*   \*   \*

Q. \* \* \* [D]id he ask you questions [after the meeting?]

\*   \*   \*   \*   \*   \*

A. \* \* \* [Farber] said, "I would like to ask you about signing this card." And I said, "yes." He said, "If I sign this card, am I going to be obligated to join the union?" And I said, "Do you mean by join the union that you're going to have to pay union dues or pay initiation fee or be required to attend meetings?" He said, "Yes, am I obligating myself to the union in any fashion as far as that goes?" And I said, "No, you're not."

Q. And during the meeting that was held for about an hour and a half, was there any discussion of an election?

A. Most definitely.

Q. And did you discuss it with employees?

A. Yes, I did.

Q. What did you tell them?

A. Initially when I opened the meeting, I started with our authorization card, our pure authorization card, and explained to them that we were attempting to organize the Tipton sales people and if we had 51 per cent of the people sign this type of an authorization card, we would demand recognition from the employer. At that point in time the employer had a decision to make and he could go one of two ways. He could grant us a card check and recognition and start negotiations with the union or he could say, no, I do not believe that you represent a majority of my people and please take your cards and go down to the Board and ask them to conduct an election.

Q. Is that when you talked about the election?

A. Yes.

Q. And what did you tell them about an election?

A. I told them if that is, indeed, what happened, that we signed a majority and the employer refused to grant us a card check and possible recognition, that we would definitely go down to the National Labor Relations Board and file a petition for a representation election \* \* \*.

Willey's testimony was corroborated by one employee and Farber's and Devino's by another. The Board credited the testimony of Willey. We find no reason to dispute that credibility finding.

Summers signed a card on November 8. She read the card, filled in the spaces and signed it. Her testimony was internally inconsistent and conflicted with an affidavit that she had previously given to an agent of the Board. She initially testified that two fellow employees, whom she identified as Union supporters, told her:

[I]f we had a union there would be a more equitable commission system for me in particular. The bedding department has had some difficulty with attracting customers. Consequently, when you are working on a commission basis you don't make very much money, and the way it was originally explained to me, with a union it would be a more equitable commission structure set up, which would, of course, enhance my earning power, and that if I signed this card I would simply be signing for an election for the right to discuss what was going to happen, to have both sides present their cases, but I was not signing the card to join the union. I was simply signing the card for an election. I was petitioning for the right of an election.

At another point in her testimony, she stated that she had been told by Union supporters that the cards would be used exclusively for an election. At a later point, she testified that she could not recall the exact words used by the Union supporters, but that it was her understanding that the cards would be used for an election. She subsequently admitted that when she gave an affidavit to a Board agent, she did not tell the agent that she had been told that the cards would be used exclusively for an election.

The Board found her quoted statement reflected the true situation and determined that the representations made therein did not require that her card be found to be invalid under *Gissel.* We agree with that assessment. It may well be that her understanding was that the cards would be used solely for the purpose of an election, but "an employee's thoughts (or afterthoughts) as to why [she] signed a union card, and what [she] thought that card meant, cannot negative the overt action of having signed a card designating a union as bargaining agent." *James H. Matthews & Co. v. N.L.R.B.,* supra at 437 (quoting *Joy Silk Mills, Inc. v. N.L.R.B.,* 185 F.2d 732 (D.C. Cir. 1950), *cert. denied,* 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951)).

IV. *The unfair labor practices justified the Board's issuing a bargaining order.*

In *N.L.R.B. v. Gissel Packing Co.,* supra, the Supreme Court held that the Board has authority to issue a bargaining order when an employer refuses to bargain with a union that has obtained authorization cards from a majority of employees in an appropriate unit and commits unfair labor practices that interfere with the Board's election processes and tend to preclude the holding of a fair election. The Supreme Court made it clear that bargaining orders were not to be limited to the " 'exceptional' cases marked by 'outrageous' and 'pervasive' unfair labor practices." 395 U.S. at 613, 89 S.Ct. at 1940. It stated that it approved "the Board's use of the bargaining order in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* at 614, 89 S.Ct. at 1940. The Supreme Court went on to say:

In fashioning a remedy in the exercise of its discretion, then, the Board can properly take into consideration the extensiveness of an employer's unfair practices in terms of their past effect on election conditions and the likelihood of their recurrence in the future. If the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order, then such an order should issue * * *.

*Id.* at 614–615, 89 S.Ct. at 1940.

It is for the Board and not the courts to make a determination based on its expert estimate as to the effects on the election process of unfair labor practices of varying intensity. The Board draws on "a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts." *Id.* at 612 n.32, 89 S.Ct. at 1939. *See Fibreboard Paper Products Corp. v. N.L.R.B.,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). Here, the Board specifically determined that before the election, the Union enjoyed the support of a majority of employees. The Board also found that the employers told the employees that with a union, they could not present their grievances directly to or discuss problems directly with management, and that a union would split the company down the middle and would threaten the loss of harmonious working relationships. On one occasion, the Board found that the employers promised to change their pay back and draw policies; and on another occasion, they implied that the salesmen's draw would have been increased but for the Union campaign. It finally found that after the Union lost the

election, and while objections to the election were pending, the employers changed their draw and pay back policies. The Board concluded that these changes, which followed an announcement by the employers that they appreciated the employees' vote of confidence, constituted a substantial benefit to employees and carried out the employers' illegal pre-election promises. We believe that these findings are supported by substantial evidence and agree with the Board's conclusion that the employers' "postelection grant of benefits rewarded employees for rejecting a union which the [employers] had earlier portrayed as a divisive force which would destroy harmonious working relationships." There is little that we can add to what the Board has said. The unfair labor practices clearly had the effect of undermining strength and destroying the laboratory conditions necessary for a fair election. The damage had been done and the only fair way to guarantee the employees' rights was to reestablish the conditions that existed before the employers' unlawful campaign.

We have considered the other contentions raised by the employers and find them to be without merit. The Board's order is enforced.

FLOYD R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent.

The record in this case does not support the Board's entry of a bargaining order, and therefore I would deny enforcement of that portion of the Board's order.

My difficulty with the majority's decision is twofold. First, their total concern appears to be only with those employees who want to join a union. Under section 7, 29 U.S.C. § 157 (1976), employees who do not want to join a union are supposed to have equal rights. Here, the rights of those who do not desire to unionize or are undecided are ignored. Second, the bargaining order in a routine case such as this ignores the general purpose of the Act to provide employees free choice in a democratic forum to express their sentiments for or against

unionization, rather than to subject them to the heavy-handed fiat of a government agency.

The Board's ultimate responsibility in this case is to protect the right of the employees freely to determine whether they desire to designate a union as their exclusive representative in bargaining with their employer. The Board's bargaining order remedy does not comport with the proper exercise of this duty. The Board has fallen into the trap of using an easy, mechanical application of general rules in a manner that impairs the free choice of the employees. The Supreme Court explicitly cautioned against this approach in *N.L.R.B. v. Gissel Packing Co.*, 395 U.S. 575, 607–09, 89 S.Ct. 1918, 1936–37, 23 L.Ed.2d 547 (1969).

In *Gissel* the Court recognized that "under the Board's remedial power there is still a third category of minor or less extensive unfair labor practices, which, because of their minimal impact on the election machinery, will not sustain a bargaining order." 395 U.S. at 615, 89 S.Ct. at 1940. The only justification for entering a bargaining order is that a count of the authorization cards collected prior to the commission of the unfair labor practices would be a "more reliable test of the employees' desires" than would the results of a rerun election. *See Gissel, supra*, 395 U.S. at 616, 89 S.Ct. at 1941. With the third category of unfair labor practices, a bargaining order is not necessary to remedy past election damage in the sense of restoring the status quo before the commission of the unfair labor practices, or necessary to deter future misconduct.

The record in the case at bar indicates that the unfair labor practices found by the Board fall squarely within this third category. The predicate findings for the Board's imposition of its order are barely supported by the evidence. Only with due deference to agency expertise can we construe the record to support the Board's conclusion that the employers committed unfair labor practices. This evidence is insufficient to warrant imposition of an order to bargain.

The Board's determination that before the election the Union enjoyed the support of a majority of employees rests upon a tenuous foundation. Only one signed card tipped the scales in favor of a majority status, while five employees claimed that union representatives had misrepresented to them the effect of signing the cards. Even the majority acknowledges that several of the cards had been signed long before the election petition was filed. *Ante* at 894 n.3. These cards are of questionable validity in determining majority status, especially in view of the company reorganization which took place in the interim and which the Union considered of sufficient significance to justify withdrawing its initial election petition and refiling it in January after the reorganization.

The statements found by the Board to constitute threats to employees that they would lose their right to deal directly with management if the Union won an election; most of the activities creating the impression of surveillance of union activity; and most of the conduct underlying the finding that an employee was refused a transfer because of his union activity were made or performed by employee Krieg. Although the Board found that Krieg could be considered an agent of the employer, substantial evidence also was presented that would support a finding that he was not a supervisor. Furthermore, the evidence indicates that the employer was not aware of his activities or remarks and did not approve or acquiesce in them.

The Board's finding that Tipton promised employees a new pay policy shortly before the election, and implemented the new policy immediately after the Union lost the election, while election objections were pending, in order to reward employees for voting against the Union and to influence votes in any rerun election, is similarly supported only by evidence which is equally susceptible of a contrary characterization. In response to a question about the possibility of increasing the monthly draw of salespersons, the employer simply correctly observed that it could not discuss any changes in employee conditions in view of the pending election, but added that a computerized study had indicated that an increase would not adversely affect profitability. An increase in the draw was announced the same day the Union filed with the Board its objections to the election. The record does not indicate whether the announcement was made before or after the filing.

Although the Board exercises a wide latitude of discretion in determining an appropriate remedy, the statutory election process and certification procedures, 29 U.S.C. § 159(c) (1976), with their acknowledged superiority as the preferred route to designating an exclusive bargaining representative, *Gissel, supra,* 395 U.S. at 602–03, 89 S.Ct. at 1934, cannot be lightly cast aside by the use of a mechanistic approach which undermines employee free choice. A finding that an employer has committed unfair labor practices after a union has procured authorization cards from a majority of employees is not sufficient by itself to warrant imposition of a bargaining order. *Gissel, supra,* 395 U.S. at 615, 89 S.Ct. at 1940. While it may be proper to accept the Board's determination that unfair labor practices have been committed, even though this conclusion rests upon tenuous evidence, when the result would be to insure employee free choice by setting aside the results of a questionable election in favor of the conduct of a new election under conditions more closely approximating laboratory fairness, accepting that determination as the basis for a bargaining order perverts the duty of the Board and this court to protect employee free choice.

Imposition of a bargaining order in the context of this case would severely impair the section 7 rights of employees, 29 U.S.C. § 157 (1976). The employee sentiment expressed through the authorization cards does not indicate a clear endorsement of the Union as a bargaining agent for the employees. The unfair labor practices found to have been committed fall into the third category of minor and less extensive practices which have a minimal impact on the election machinery. The use of traditional remedies, including the conduct of a fair

rerun election, would thus be the superior method for determining the employees' desires in this case.

I would therefore deny enforcement of the bargaining order.