**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**CRYSTAL TIRE COMPANY, Respondent.**

No. 19324.

United States Court of Appeals Eighth Circuit.

May 29, 1969.
Rehearing Denied July 27, 1969.
Rehearing En Banc Denied Aug. 7, 1969.

Abigail C. Baskir, Atty., N. L. R. B., for petitioner, and Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Elliott Moore and Herbert Fishgold, Attys. for N. L. R. B., on the brief.

Thomas M. Hanna, St. Louis, Mo., of McMahon & Berger, Clayton, Mo., for respondent.

Before VAN OOSTERHOUT, Chief Judge, and MATTHES and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

On June 19, 1967, the National Labor Relations Board found that Crystal Tire Company had violated § 8(a) (1) of the National Labor Relations Act by unlawfully interfering with the union organizational activities of its employees and § 8(a) (3) and (1) of the Act by discharging its employee Leroy White for his union organizational activities.[1] The Board, pursuant to § 10(e) of the Act, petitions this Court for enforcement of its order, which:

(1) directs Crystal Tire to cease and desist from interfering with its employees' organizational rights guaranteed by § 7 of the Act;

(2) directs Crystal Tire to reinstate Leroy White with back pay;

(3) directs Crystal Tire to recognize and bargain with the Automotive, Petroleum, and Allied Industries Employees Union, Local 618, which is an affiliate of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America.

On March 6, 1966, Lemuel Massa, Elmer Massa and Leroy White, employees in the Crystal Tire service department, began a union organizational campaign. By the evening of March 17, seven of the fourteen employees of Crystal had signed cards authorizing Local 618 to serve as their collective bargaining agent. The news of this organizational activity was quickly communicated to Russell Bauman, the president and an owner of Crystal Tire Company. On the morning of March 18th, Bauman summoned Elmer Massa to his office and asked him

---

1. The Board's decision and order are reported at 165 N.L.R.B. #82.

whether he and White were responsible for the union activity. Massa evaded the question. Bauman further stated that he was "going to let Leroy [White] go that day".

Later the same day, employee Halbrook informed Bauman that "the boys in the back are talking about going union" and "they tell me I have to go union". Bauman thereupon called both Elmer and Lemuel Massa into his office and stated that, if they wanted a union, they should work for another company and, if there should be a union, he would not be able to retain all of the employees and would probably have to shut down. Lemuel Massa complained that he had to work fifty hours a week for a hundred dollars and Bauman replied, "What would it take, a hundred dollars for about 40 hours?" Bauman also informed them that White "was through" and that they could "take that for what it's worth". Later this same day, Bauman told Elmer Massa that he would be willing to bargain with the "Glass Workers Union" but he could not afford Teamsters wage rates and would have to "cut everybody to 40 hours" if he had to pay those rates.

On March 19, Bauman was informed by the union local affiliated with the Teamsters that it had been designated as collective bargaining representative by a majority of Bauman's employees. He thereupon called the Glass Workers Union and asked for help. On March 21, Crystal foreman Paul Courtaway informed a group of employees that he had arranged a meeting for them that evening with representatives of the Glass Workers Union. Lemuel Massa complained that he did not want to go and Courtaway retorted, "Well, you have to go".

The Board affirmed the ruling of the Trial Examiner that Bauman's questioning of Elmer Massa was coercive and in violation of § 8(a) (1) of the Act. The Trial Examiner also concluded that the company had violated § 8(a) (1) of the Act by Bauman's suggesting that he would be willing to change Lemuel Massa's hours of employment and rate of pay; by his telling Elmer Massa that he would be willing to sign a contract with the Glass Workers Union; and by Courtaway's arranging of a meeting with the Glass Workers representative and insisting that the employees attend.

Contrary to the Trial Examiner's findings, the Board found an 8(a) (1) violation in:

"President Bauman's statement to employees Lemuel and Elmer Massa that, if unionized, Respondent would have to stop work on its new recap shop, that Respondent could not keep all of its employees if it had to pay union scale, that Respondent would have to shutdown, that Lemuel and Elmer Massa should join their brother at the Chrysler plant if they wanted a union, that they would be hurt by the Teamsters' contract, that Respondent could not pay overtime at Teamster rates, and that Respondent would have to 'cut everybody to 40 hours' if it had to pay Teamsters' rates."

Bauman's statements were made in the heat of emotional turmoil. He was obviously perturbed in contemplating dealing with the union. Nevertheless, the language was coercive in nature and went beyond the perimeter of the protected area of employer free speech recognized in NLRB v. Hawthorn Co., 404 F.2d 1205, 1212 (8th Cir. 1969); NLRB v. Herman Wilson Lumber Co., 355 F.2d 426, 432 (8th Cir. 1966). The effect of the employer statements must be judged in the light of circumstances in which words innocent in and of themselves may be understood as threats. See, for example, NLRB v. Hawthorn Co., supra; NLRB v. Louisiana Mfg. Co., 374 F.2d 696, 703 (8th Cir. 1967). Words though coercive in meaning may neither be so intended nor have that effect. Such issue is generally one of fact for the Board's initial consideration. We find no fault in the Board's conclusion on these § 8(a) (1) issues.

We also affirm the Board's finding of an 8(a) (3) violation in Bauman's firing of employee White. The company

points to after-the-fact reasons for the firing of White alleging that he often was late for work, that he complained to customers of his low pay and that he otherwise was not rendering satisfactory service. The company contends that a decision had been made to discharge White prior to the incidents of mid-March and that this is evidenced by the hiring of a replacement who was scheduled to report for work on March 21. The company further contends that Bauman told Elmer Massa on the morning of March 18 that he was going to fire White and that this conversation occurred prior to Halbrook's notifying Bauman of the union activity. However, it appears that Bauman realized that an effort was being made to unionize the plant, as demonstrated by his pointed question to Massa as to whether White had started the union drive. It is properly the province of the Board to weigh the evidence and we feel that its determination on this matter is supported by substantial evidence.

We now consider the remedy adopted by the Board, which is an order directing the company to bargain with the Teamsters. The Trial Examiner attempted to explain the use of a bargaining order in the following manner:

"I agree that a bargaining order would be appropriate if the Union represented a majority of Respondent's employees in an appropriate bargaining unit when Respondent began its course of unfair labor practices. The issue of the Union's representative status was fully litigated at the hearing. For the reasons given below, I find that the Union was the majority representative of Respondent's employees on and after March 17.

\*    \*    \*    \*    \*    \*

Having found that Respondent has engaged in certain unfair labor practices, I shall recommend that it cease and desist therefrom and take certain affirmative action designed to effectuate the policies of the Act. As the record establishes that the Union had a clear majority in an appropriate

unit when Respondent committed unfair labor practices aimed at destroying support of the Union I shall also recommend, so that Respondent shall not gain any advantage from its violations of Section 8(a) (1) and (3) of the Act, that Respondent bargain collectively with the Union as the exclusive bargaining representative of its employees."

█ As a part of this determination, the Trial Examiner deemed that an appropriate all-employee bargaining unit would constitute ten of the fourteen full-time Crystal Tire employees. He excluded certain employees including supervisory and clerical workers and others who lacked "sufficient community interest with the employees in the unit". The Board, which accepted the recommendations of the Trial Examiner, has wide discretion in determining an appropriate bargaining unit because of its special expertise. 29 U.S.C. § 159(b). See, Packard Motor Car Co. v. NLRB, 330 U.S. 485, 491, 67 S.Ct. 789, 91 L.Ed. 1040 (1947); Pittsburgh Plate Glass Co. v. NLRB, 313 U.S. 146, 152, 61 S.Ct. 908, 85 L.Ed. 1251 (1941); NLRB v. Wm. J. Burns International Detective Agency, Inc., 346 F.2d 897, 900 (8th Cir. 1965); NLRB v. Hurley Co., 310 F.2d 158, 161 (8th Cir. 1962). It is not necessary in this case to decide whether the proposed bargaining unit was a proper one. For the purpose of dealing with the compulsory bargaining issue, we shall assume the propriety of the bargaining unit suggested by the Trial Examiner and approved by the Board.

█ Generally speaking, the National Labor Relations Board has discretion to fashion an appropriate remedy to offset an employer's unfair labor practices. The Board may require compulsory bargaining even though there has not been an election and certification but this power must be used sparingly and only in appropriate situations. See, NLRB v. Arkansas Grain Corp., 390 F.2d 824, 830–831 (8th Cir. 1968); NLRB v. Goodyear Tire & Rubber Co., 394 F.2d 711, 712–713 (5th Cir. 1968); Wausau

Steel Corp. v. NLRB, 377 F.2d 369 (7th Cir. 1967).

With regard to such remedy, we have said:

"We do not doubt that a bargaining order rather than a cease and desist order may at times be an appropriate remedy to restore the status quo, particularly where the union's support among the employees has been chilled as the result of the employer's unfair labor practices, the effects of which might vitiate any strong union support in a subsequent election. * * * As stated above, Respondent did not engage in any outrageous or aggravated conduct. We do not believe therefore that its conduct, though in violation of Section 8(a) (1), would have such a substantial impact on the employees' freedom of choice in a second election as to render nugatory the effect of a cease and desist order." NLRB v. Arkansas Grain Corp., *supra*, 390 F.2d at 831.

In order to sustain the use of a bargaining order in this case, the record must support the finding that union support among the majority of the employees was materially diminished by the employer's interference with the employees' unionization efforts. The company anti-union activity persisted for only a few days. It is difficult to characterize the activities of Bauman and Courtaway as "outrageous or aggravated conduct" which had the ultimate effect of destroying the union's claimed majority status. Indeed, the record suggests that their tactics actually stiffened employee resistance to the short-lived anti-union campaign. Each of the company's ploys was rebuffed by the employees. Lemuel Massa categorically turned down Bauman's offer to increase his salary. Elmer Massa's unhesitating response to the employer's interrogation seeking names of those employees responsible for pro-union activity was to tell Bauman that he, Elmer, would be a "damn fool" not to support the union. Each of the employees refused to attend the meeting which had been arranged for them with the Glass Workers Union.

The use of a bargaining order proposed in this case is predicated on restoring the status quo between the parties and assumes that the employer's unfair labor practices substantially weakened the employees' adherence to their union. Such conclusion is not supported by substantial evidence in the record. Under our standards for review as enunciated in Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), we are unable to affirm that part of the Board's order which directs Crystal to bargain with the union. Accordingly, the Board's petition for enforcement of its order is granted except for that part of the remedy which directs Crystal to bargain with the Teamsters Union.