**NATIONAL LABOR RELATIONS
BOARD, Petitioner,**

v.

**MIDWEST HANGER CO. AND LIBERTY
ENGINEERING CORP., Respondent.**

No. 72–1115.

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 13, 1972.

Decided Feb. 20, 1973.

Rehearing and Rehearing En Banc
Denied March 15, 1973.

Jonathan Axelrod, Atty., N.L.R.B., Washington, D. C., for petitioner.

John A. McGuinn, Washington, D. C., for respondent.

Before GIBSON and LAY, Circuit Judges, and DURFEE,* Court of Claims Judge.

GIBSON, Circuit Judge.

The National Labor Relations Board seeks enforcement of its decision and order reported at 193 N.L.R.B. No. 85. The Board found that Midwest Hanger Company and Liberty Engineering Corporation[1] committed unfair labor practices in (1) coercive interrogation of one employee, (2) discriminatory discharge of 18 employees during a union organizing campaign, (3) threatening striking employees with discharge or other reprisal and (4) discharge of one employee at the conclusion of an unfair labor practices strike upon his unconditional offer to return to work.

Although an election petition was filed, no election has yet been held. The Board ordered reinstatement with back pay for all concerned employees and further entered a bargaining order based upon its finding that the employer's actions precluded the holding of a valid election.

*The Factual Background:* The United Steelworkers of America, AFL–CIO, began its campaign to obtain recognition as the bargaining representative for the employees of the Company on June 1, 1970, when four employees signed authorization cards. The campaign reached its peak on June 11 and 12, when the Union mailed a letter to the president of the Company requesting recognition and offering to prove its majority status by submitting the signed authorization cards to a neutral party for inspection and verification. The Company received the letter on Monday, June 15; it made no reply.

During the intervening weekend the Company, which manufactures laundry and dry cleaning products, had selected 22 employees for discharge. These terminations were attributed to an expected decline in business due to a previously announced price increase effective as of June 15. Jones, the President of the Company, testified that their customers built up large inventories between the announcement and the effective date of the price increase. This had two effects: first, it caused an increase in work load over normal levels during the period just prior to the date of increase as customers built up their stock at the lower price, and second, it caused a decrease in business after the date of the increase as these customers reduced their inventories to normal levels. The standard which the Company claimed to have used in selecting the employees to be terminated was the efficiency of the employee based on skills, attendance habits and ability. The Company contends that the employees discharged were the least efficient of its employees.

---

* United States Court of Claims Judge sitting by designation.

1. These two companies have a common ownership and management and occupy the same building, employing approximately 90 production and maintenance persons. Reference hereafter will be as to the Company and will include either or both companies as appropriate.

*The Discriminatory Discharge:* The General Counsel charges that the Company violated Section 8(a)(1) and (3) by the discharge of 18 named employees during the weekend of June 13 and 14 and thereafter. Seven of the employees were discharged during the weekend, six on Monday, June 15, and two on Tuesday, June 16. Two of the other three were discharged on July 1 and the other on August 11.

The discharge of a large numer of employees including some union leaders during a union organizing campaign would appear to be "inherently destructive of employee interests," thus placing the burden on the Company of explaining away or justifying its action. As said in NLRB v. Great Dane Trailers, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967):

> "From this review of our recent decisions, several principles of controlling importance here can be distilled. First, if it can reasonably be concluded that the employer's discriminatory conduct was 'inherently destructive' of important employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations."

Though a reduction in work force was clearly in order, the manner in which the Company made the reduction gave rise to a finding by the Board that the stated reasons given were pretextual.

Even though the employer may reduce its number of employees, it may not discriminate because of union activity in the selection of those to be terminated. The General Counsel relied initially on a percentage test to show that the selection procedures had been used to discriminate against the union employees. Of the 18 discharged employees, all but one had signed authorization cards. This presented a telling percentage of 95 per cent discharge of union adherents while the percentage of union employees in the plant as a whole was 70 per cent. This on its face would indicate a discriminatory discharge violative of the Act. Hamilton-Brown Shoe Co. v. NLRB, 104 F.2d 49, 53 (8th Cir. 1939); see, Annot. 153 A.L.R. 841 (1944). The Company challenges these statistics by countering that other discharges of non-union adherents during the same period of time as the discharges in question would alter the figures. This may be correct, but there still exists substantial evidence in the record from which the Board could infer that the discharges questioned were discriminatory, and the Board can properly consider in context the discharges made during a crucial period of the organizing campaign.

As stated by Judge Lay in NLRB v. The Freeman Company, 471 F.2d 708 (8th Cir. 1972):

> "The rule is generally recognized that where the company demonstrates a proper business reason which standing alone would justify the company's action affecting employees, the Board has the burden to overcome this fact and demonstrate that the reasons exercised by the company were pretextual. Reliance Insurance Companies v. N. L. R. B., 415 F.2d 1, 7 (8 Cir. 1969); N. L. R. B. v. Gotham Industries, Inc., 406 F.2d 1306, 1309 (1 Cir. 1969)."

We feel the Board here has carried, with exceptions later discussed, its burden of proof. Although evidence of a proper business purpose was supplied by the Company, the record contains substantial evidence to overcome the prima facie business purpose and to warrant an inference of discrimination. The most persuasive of this evidence is the showing by General Counsel that while these employees[2] were discharged rather than

---

2. These employees were Ronald Greathouse, David Covey, Virgie Peterson, Margaret Buckley, Sharon Meier, James Walter Forbis, John Ashby, Marilyn Kimberlin, Shirley Lauderdale, William Greathouse, June Elliott, Joseph DeMent,

laid off, the Company continued to advertise in a local newspaper for new employees, and that within a month after the discharge of these employees the Company began to hire new employees to maintain the work force at the new reduced level.[3]

These discharges must be considered along with the Company's assertion that its biggest problem was employee turnover and the resulting inexperience of its work force. The Company alleged that the employees selected for termination were so selected because they were the least efficient of the Company's work force. This explanation implied that the employees met the minimum level of competency required to perform the work. The Company chose to ignore this ready pool of at least minimally qualified persons when it needed additional employees to replace the normal turnover occurring after the reduction in force. Instead of utilizing previously experienced employees, it recruited new, untrained personnel. This action was inconsistent with both the reasonable needs of the business and, more importantly, with the employer's past practice during slack business periods.

 While we recognize that the National Labor Relations Act does not give the Board license to dictate the method by which an employer must reduce his work force, the Board may consider the method selected just as it does any employer action affecting employees where it finds that the action was taken for a prohibited purpose. The method selected for the reduction in work force may in itself be evidence of a discriminatory purpose when considered in light of the surrounding circumstances. The Act protects employees' rights to organ-

ize and bargain collectively and any action taken by management to thwart that right is violative of the Act.

Majestic Molded Products, Inc. v. NLRB, 330 F.2d 603 (2d Cir. 1964), presents a factual situation sufficiently analogous to the instant case to lend authoritative support to the Board's position. In *Majestic* two related companies had the same officers and shareholders and shared the same building. Both companies were unionized. During a period when a rival union was trying to gain recognition as the bargaining representative in one of the companies, Lucky Wish Products, Inc., a substantial number of employees were laid off. The company alleged that the layoff was due to a decline in business. At the same time, however, the sister company, Majestic Molded Products, Inc., increased its work force. The Court held that Majestic's failure to hire the employees laid off by Lucky Wish, in the absence of credible evidence other than the bare statements of management that the employees laid off by Lucky Wish were not qualified to perform the work done at Majestic, would support an inference that the layoff had been made because of the union activity and not for the reasons advanced by the employer.

The Company's failure here to preserve this group of experienced employees in combating normal attrition of workers, indicates a desire to permanently disassociate these employees from the Company, a desire which would be consistent with an anti-union motivation in the terminations. The Board, at least, could draw this permissible inference of illegal discrimination from the factual situation presented. Also casting doubt on the Company's explanation

---

Michael Owens, Charles Lankford and John Sells. These employees were all discharged over the weekend of June 13–14 or the two days following. Three other employees were found to have been discharged for union activities, however their discharges were removed in time from the discharges due to the decline in

business and the employer did not allege that these employees were discharged for that reason. These three discharges will be discussed separately.

3. The Company hired seven employees in the latter half of June, ten in July and 22 in August.

that the employees selected for termination were the least efficient employees in the plant is the fact that the selections were made without consulting the foremen who as members of management could best evaluate job performance of the employees. Although it was proper for the Company officials to reserve to themselves the decision on the dischargees, their failure to consult with the supervisors who best know the efficiency of each employee indicates that the criteria which was followed in making the selections was focused on some other aspect of the employee's conduct rather than efficiency.[4]

Although the evidence in this case is conflicting on the charge of discrimination in the discharge of the named employees, there is substantial evidence from which the Board could permissibly infer discriminatory motives in the discharges, and we must enforce the Board's Order providing for reinstatement and back pay for these employees.

■ Two other employees were discharged on about July 1, allegedly for excessive absences. Elaine Peukert was absent 55.5 hours between January 1 and June 16, and she had received several warnings. She was not absent from June 16 to the time of her discharge. Kim Bristow was absent on June 16 and the next day was given a written warning. On June 29, she requested the next day off to go to the doctor and received permission. On her return to work on the following day, she was informed that she was discharged for repeated absenteeism. She was not absent between June 17 and June 29. During this period both employees had engaged in overt union activities which had come to the attention of management.

The Hearing Examiner found that these two employees had been discharged in violation of the Act and the Board ordered their reinstatement with back pay.

Due to the prior discharges which we have found to be an unfair labor practice, the intervening union activity and the length of time between any unexcused absence and the discharge, there is substantial evidence to support the Board's findings and the Order will be enforced as to those two employees.

■ Betty Johnson was discharged on August 11 for excessive absences. The General Counsel concedes that she had been "frequently absent prior to June 6." On June 16, she received a written warning concerning absences. She refused to sign the warning. On July 13, after several more absences, she was again given a written warning. After four more absences she was discharged. Conceding that she was active in the union organization drive, it is obvious that the employer had ample cause to discharge her for aggravated and continued absenteeism, and, in the absence of any evidence that this discharge was motivated by any prohibited purpose, we hold that the finding that the discharge was in violation of the Act is not supported by substantial evidence. We, therefore, will not order enforced that portion of the Board's Order which required her reinstatement and back pay.

*The Coercive Interrogation:* John Sells applied for employment with Liberty Engineering in February 1970. At the employment interview Sells was asked how he felt about unions. He replied that in theory unions were "one of the greatest things that had ever been brought about," but that sometimes they get misused. The interviewer told him that they might have some union trouble. Sells replied that since the plant was located in an area where most of the companies were non-union he wouldn't have anticipated any trouble at all. Sells was hired about one week after the interview.

---

4. This would not necessarily be true where there was some system of employee evaluation in effect by which the higher management officials would have a valid gauge available to objectively measure the employee's abilities.

On June 15, the General Manager came to Sells at work and asked him if he had heard any union talk around the plant. Sells answered that he had and upon being asked how long he had heard the talk, replied "At least a couple of weeks." The General Manager asked Sells to inform him if he heard anything else. Later that afternoon Sells was discharged.

Under the criteria set out in NLRB v. Ritchie Mfg. Co., 354 F.2d 90, 99 (8th Cir. 1966), we find there is substantial evidence in the whole record to support the Board's finding of coercive interrogation. Under *Ritchie* we look not only to the questioning itself but also at the circumstances surrounding the interrogation. *Ritchie* pointed out five circumstances which should receive close attention. These are:

"[A] history of employer hostility and discrimination, the nature of the information sought (e. g., was the interrogator seeking information from which he could take action against individual employees), the identity of the questioner (i. e., what was his position in the company), the place and method of interrogation, and the truthfulness of the reply (e. g., did the interrogation inspire fear leading to evasive answers)." 354 F.2d at 99.

These standards had been previously enunciated by the Second Circuit in Bourne v. NLRB, 332 F.2d 47, 48 (2d Cir. 1964).[5]

In the instant case certain of the circumstances point to the interrogation as having a coercive effect. The interrogation occurred against the background of a substantial discharge of employees at the time of the interrogation. The questioner, Ward, was the General Manager of the Company. Although the questioning took place at Sells' work area it was under circumstances by which Sells might think that Ward had sought him out for questioning rather than having the questions occur in a casual conversation. Finally, Sells' answers while not untruthful were evasive. Sells was one of the instigators of the union movement and was well aware of the extent of the union campaign at the time of the questioning. He did not, however, volunteer this information or any information to Ward. Management could and probably did view his answers as unsatisfactory to it; hence, his discharge.

These facts constitute substantial evidence to support the Board's conclusion that the questioning was coercive and therefore constituted an unfair labor practice under 29 U.S.C. § 158(a)(1).

*The Letter to the Strikers:* It is disputed whether a letter sent by the Company to the striking workers was found to be a violation of the Act. The letter was dated October 30, and informed the employees that the plant would reopen on Monday, November 2; and that employees who did not "wish to report to work as scheduled [would] be given until Wednesday, November 4, to seriously consider [their] decision."

In the amended complaint the General Counsel alleged that this letter contained the threat of discharge or other reprisal directed at the striking employees. No other activity of the Company which

---

5. The Fifth Circuit added a caveat in NLRB v. Camco, Inc., 340 F.2d 803, 804 (5th Cir.), cert. denied, 382 U.S. 926, 86 S.Ct. 313, 15 L.Ed.2d 339 (1965). The Court said, "This list is not intended to be definitive and . . . intimidation may occur even if all these factors cut in favor of the employer. [Bok] warns [Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 107 (1964)] that 'employers must beware of interrogation unless (1) they have a valid purpose for obtaining information concerning the union's strength; (2) they communicate this purpose to the employees; and (3) they assure the employees that no reprisals will be taken.' " The Court there points out that even though the factors favor the employer under the *Bourne* test, intimidation may nevertheless occur if the employer does not heed the warning of *Camco.* This seems to be sound advice.

could be construed as such a threat was litigated. The Hearing Examiner found that "by threatening employees with discharge or other reprisals for engaging in a strike, the [Company] violated Section 8(a)(1) of the Act." While the decision is not pinpointed with regard to this letter, in the context of the entire record the finding can only be construed to relate to the letter. The letter can certainly be viewed as coercive and as an illegal interference with the employees' right to organize.

That portion of the Order which requires the employer to cease and desist threatening the employees with discharge or other reprisals is ordered enforced.

*Termination of Grover Speck:* On October 22, 1970, the employees on the second shift picketed the plant demanding the reinstatement of the employees discharged since June 12. They were later joined by employees from the other two shifts. Grover Speck, a long haul truck driver for the Company, was scheduled to haul a load out that evening. He arrived at the plant about 5:00 p. m. but upon the request of the strikers, refused to cross the picket line. When the strike ended and the other employees returned to work Speck was discharged. The Company alleged that the discharge was for cause putting forward four independent grounds as giving cause for discharge. These were: (1) failure of Speck to return a telephone call from the Company president relating to loads delivered before the strike, (2) uncomplimentary remarks made about the Company president during a job interview, (3) misconduct during the strike, and (4) abuse of leased equipment.

The latter two of these reasons, if true, give adequate cause for discharge. The misconduct which was alleged was that during the strike Grover Speck had followed a replacement driver, who was then operating a company truck, in an unsafe manner, at high speeds on a narrow winding road. The employer presented the testimony of the truck driver as to the occurrence of this event and it was corroborated by the Company president who saw Speck's car leave following the truck and another Company employee who testified that he saw Speck's car following the truck. Speck denied that the incident occurred.

The Board has held that "admitted reckless driving in pursuit of an employee in another automobile during the strike was conduct which justified [the employer] in denying his request for reinstatement." United Brass Works, 126 N.L.R.B. 537, 545 (1960). This Court has held that if the employer had reasonable cause to believe that the striking employee had been engaging in unprotected strike activities and, in reliance on that belief, refused to reinstate him, no violation of the Act results. Local No. 3, United Packinghouse Workers of America, CIO v. NLRB, 210 F.2d 325, 331 (8th Cir.), cert. denied, 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648 (1954).

The Hearing Examiner found that the record did not support this defense, but no explanation of this finding was made. Although the reckless driving was not admitted by Speck, there was no finding of a lack of credibility of the three Company witnesses who testified concerning the incident. There was no finding supported by substantial evidence, or any evidence at all, that the reason for discharge was pretextual and that the true motive for Speck's discharge was his union activities. The record clearly supports the occurrence of the incident.

Another ground which would justify the Company's refusal to reinstate Speck was the alleged abuse of equipment used by Speck. Midwest Hanger does not own its trucks; they are leased from Schock Leasing, Incorporated. Under the terms of the lease, Midwest furnished the drivers and Schock performed all maintenance and repairs. In the case of abuse of equipment by the drivers Schock may require the Company to replace a driver. If Midwest does not do so Schock can shift the cost of repairs to Midwest. The president of Schock Leas-

ing testified that the equipment assigned to Speck had been abused, that he had been observed operating it in an improper manner, that his equipment required excessive repairs, and that the engine governor had been tampered with, allowing the engine to overrun, resulting in damage. The president of Schock Leasing contacted President Jones of Midwest Hanger and told him that Speck would have to be replaced. The Hearing Examiner did not credit this testimony because no documentary evidence was produced to support the testimony of the president of Schock Leasing.

There appears to be no reason to discredit the testimony of the president of Schock Leasing for failing to bring in books and records to support his testimony. The "best evidence" rule is not applicable here; he did not testify as to the contents of the records. If there was any doubt in the mind of the General Counsel, the records were equally available to him through the use of the discovery procedures provided. There is no reason to believe that the witness was other than a disinterested third party. It is also relevant to note that the central thrust of the testimony, the fact that Schock Leasing told Midwest Hanger that Speck would have to be replaced, would not be found in the records.

The Board's decision that Grover Speck was discharged because of his union activities is not supported by substantial evidence on the record considered as a whole. While we recognize that strikers are generally entitled to reinstatement upon their unqualified offer to return to work, subject to the availability of a job in the case of an economic striker, such a right is not absolute; there are certain recognized exceptions to the rule. Both of the reasons which we have discussed fall within such exceptions. After the employer has offered legitimate business reasons which would justify his actions, the Board plainly has the burden of going forward and offering evidence that the reasons advanced were pretextual. NLRB v. The Freeman Co., *supra*. The General Counsel's bare contention that this discharge was motivated by Speck's union activity is unsupported by any evidence whatsoever and further is refuted by the record; no other striking employees were discharged and this discharge was isolated by more than four months from the other discharges associated with union activity in the plant. That portion of the Board's order which requires reinstatement and back pay for Grover Speck is denied enforcement.

*The Bargaining Order:* On the basis of the unfair labor practices which had been found, the Board concluded that since the Union had acquired cards from a majority of the employees and since the employer's conduct had tended both to destroy that majority and to negate the likelihood of a future fair election, a bargaining order would be appropriate. The employer challenges this bargaining order on the sole grounds that it committed no unfair labor practices. We have found substantial evidence to support the findings of unfair labor practices as to all those charges except the discharge of Grover Speck and Betty Johnson. In view of these findings the contention of the employer is without merit and the bargaining order is granted enforcement.

The Board's Order is enforced except for that portion which requires reinstatement and back pay for Grover Speck and Betty Johnson.