NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

INTERTHERM, INC., Respondent.

No. 78–1495.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 13, 1978.

Decided March 19, 1979.

As Amended April 25, 1979.

---

Barbara G. Gehring, Atty., N. L. R. B., Washington, D. C., for petitioner; John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Washington, D. C., on brief.

D. Michael Linihan, of McMahon, Berger, Breckenridge, Hanna, Linihan & Cody, St. Louis, Mo., for respondent; Ralph E. Kennedy, St. Louis, Mo., on brief.

Before BRIGHT and HENLEY, Circuit Judges, and HARPER, Senior District Judge.*

HENLEY, Circuit Judge.

The National Labor Relations Board petitions this court pursuant to § 10(e) of the National Labor Relations Act for enforcement of its order against Intertherm, Inc. This order enumerates ten instances where the conduct of the Company's management and supervisory personnel allegedly violated § 8(a)(1) of the NLRA by interfering with, restraining or coercing employees who were exercising their rights to gain union representation by consent election in accord with § 7 of the Act. Intertherm was directed to cease and desist from these unfair labor practices and to post notices which detailed the rights of its employees and stated that the Company would comply with the Board's order. In addition, the Board found one violation sufficiently serious to warrant setting aside the consent election in which Intertherm's employees had rejected representation by the International Union, United Automobile, Aerospace & Agricultural Implement Workers of America. We grant enforcement of the Board's order insofar as it relates to the seven instances where we affirm the Board's finding of a violation. But we refuse enforcement with regard to the remaining three alleged violations.

* The Honorable Roy W. Harper, United States Senior District Judge, Eastern and Western Districts of Missouri, sitting by designation.

This controversy stems from the Union's efforts to organize employees at four Intertherm plants in St. Louis during late 1976 or early 1977. The organizing campaign was directed at the Company's production and maintenance employees and largely consisted of voter solicitation, hand-billing and the distribution of union authorization cards, bumper stickers, lapel buttons and pocket protectors, many of which bore the Union logo. A group of Intertherm employees aided in implementing this publicity campaign and in monitoring the consent election, which was held on January 14, 1977. The Union lost the election by a vote of 201 to 216, with ten ballots subject to challenge.

With one exception, the unfair labor practices charged in the Board's order occurred either in the Company's 38th Street Plant or its Gustine Plant.[1] And all relate to the various ways in which the Company, acting through its managers and supervisors, sought to prevent unionization by discouraging pro-union employee activities. For convenience and after a brief discussion of the applicable legal standards we treat these violations according to plant situs.

## I

■ Section 7 of the NLRA guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . ." 29 U.S.C. § 157. Section 8(a)(1) protects these rights by making it an unfair labor practice for an employer "to interfere with, restrain or coerce employees in the exercise of the rights guaranteed in [Section 7] . . . ." 29 U.S.C. § 158(a)(1). In evaluating employer conduct pursuant to this latter provision, we have stated that the test is not whether an attempt at coercion has succeeded or failed, but whether "the employer engaged in conduct which reasonably tends to interfere with, restrain, or coerce employees in the free exercise of their rights under Section 7." *Russell Stover Candies, Inc. v. N. L. R. B.*, 551 F.2d 204, 208 (8th Cir. 1977).

■ We are, of course, bound to accept the Board's determination of a § 8(a)(1) violation in accord with this standard provided that its findings are supported by substantial evidence on the record considered as a whole. *Universal Camera Corp. v. N. L. R. B.*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *R. J. Lallier Trucking v. N. L. R. B.*, 558 F.2d 1322, 1325 (8th Cir. 1977); *N. L. R. B. v. Fremont Mfg. Co.*, 558 F.2d 889 (8th Cir. 1977). Such findings are entitled to respect and must not be set aside unless "the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both." *Universal Camera Corp. v. N. L. R. B., supra*, 340 U.S. at 490, 71 S.Ct. at 466. And

> we are required to keep in mind that it is the function of the Board, and not of this court, to pass upon questions of the credibility of witnesses and the weight to be given to their testimony, and that the Board is free to draw such reasonable inferences as may be warranted by the evidence.

*R. J. Lallier Trucking v. N. L. R. B., supra*, 558 F.2d at 1325. *See also N. L. R. B. v. Fremont Mfg. Co., supra*, 558 F.2d at 890–91; *N. L. R. B. v. Melrose Processing Co.*, 351 F.2d 693, 698 (8th Cir. 1965). Mindful of the above standards, we proceed to an evaluation of the Board's unfair labor practice determinations.

## II

*38th Street Plant Violations.*

■ The Board charged Intertherm with three § 8(a)(1) violations for its supervisory

---

1. One alleged violation relates to a speech made by Intertherm Vice President Oxley at all four plants. For organizational purposes, this incident is discussed with the Gustine Plant violations.

activities at the 38th Street Plant. These violations related to two separate incidents in which plant supervisors interfered with the employees' right to wear union insignia. It has long been recognized that an employer may not restrict that right absent exigent circumstances relating to employee efficiency or plant discipline. *Republic Aviation Corp. v. N. L. R. B.,* 324 U.S. 793, 802 n.7, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *Serv-Air, Inc. v. N. L. R. B.,* 395 F.2d 557, 563 (10th Cir.), *cert. denied,* 393 U.S. 840, 89 S.Ct. 121, 21 L.Ed.2d 112 (1968); *Fabri-Tek, Inc. v. N. L. R. B.,* 352 F.2d 577, 584–87 (8th Cir. 1965). And we grant enforcement of the Board's order with respect to these three violations.

■■ In the first incident, employee Eugene Smith was walking through the plant wearing a union lapel pin and pocket protector. As he passed by supervisor Alvin Frost and Frank Caleco, another rank-in-file employee, Caleco stated to Smith, "you can't wear that [the union insignia], you can get fired." Supervisor Frost made no attempt to disavow or correct this threatening statement but instead ordered Smith to remove the insignia until Frost could check with the plant personnel office. Smith complied with this order but Frost never returned to inform Smith of his right to wear such insignia.

Both the Board and the Administrative Law Judge (ALJ) who heard testimony from Smith and Frost determined Frost had ratified Caleco's threatening remark. Such remarks, if they are made by or are properly imputed to supervisors, constitute obvious violations of the Act. Here Frost not only failed to repudiate or correct Caleco's threat but, in effect, reinforced it by immediately ordering Smith to remove the insignia until Frost could determine the propriety of wearing them. He then left the threat outstanding by failing to clarify the situation as promised. The Board found a second violation in Frost's order to remove the insignia because, taken alone, it constituted an interference with Smith's right to campaign for the Union.

There is much authority for the proposition that a supervisor commits an unfair labor practice by ratifying the illicit threats of another. *See, e. g., Stewart & Stephenson Services, Inc.,* 164 NLRB 741, 65 LRRM 1314, *enf'd,* 414 F.2d 232 (5th Cir. 1969); *E. B. Law & Son,* 92 NLRB 826, 27 LRRM 1168 (1950), *enf'd,* 192 F.2d 236 (10th Cir. 1951). *Cf. N. L. R. B. v. Mike O'Connor Chevrolet, Inc.,* 512 F.2d 684, 688 (8th Cir. 1975) (employee's remark not imputed to supervisor who had merely failed to disavow the remark). After reviewing the record, we are convinced that there is substantial evidence supporting the Board's finding of such a ratification here. We also agree that Frost committed an additional violation by ordering Smith to remove the union insignia and then failing to ensure Smith was notified of his right to replace them.

■ The final violation at the 38th Street Plant occurred when supervisor Sandbothe interfered with employee Gilliam's right to wear campaign insignia by covering the union logo on Gilliam's plastic pocket protector with a small sticker bearing the Intertherm logo. Gilliam spent the remainder of the election day wearing the company sticker and explained its presence to several other employees.

The Company argues there was no unfair labor practice in this incident because Sandbothe's actions were part of a running joke between Gilliam and Sandbothe and were not coercive. Sandbothe admitted covering the union logo but stated he was only joking and that Gilliam was free to remove the sticker. Gilliam, on the other hand, admitted there was laughter in the conversation before this incident but thought he was required to keep the union logo covered. The ALJ credited Gilliam's testimony that the affair was no joking matter and found a violation. The Board agreed. With some misgiving we refuse to reject the ALJ's determination and hold that he drew a reasonable inference of coercion which was warranted by the evidence. *R. J. Lallier Trucking v. N. L. R. B., supra,* 558 F.2d at 1325. The mere fact that there was laughter between Sandbothe and Gilliam did not

preclude the administrative finding that an act of coercion or restraint had taken place. *See, e. g., N. L. R. B. v. Speed Queen,* 469 F.2d 189, 192 (8th Cir. 1972).

*Gustine Plant Violations.*

The Board found seven § 8(a)(1) violations at the Gustine Plant relating to six separate incidents. We grant enforcement of the Board's order with respect to four of these violations.

■■ The Board initially asserts that Intertherm violated the NLRA at the Gustine Plant by conducting unlawful, overt surveillance of employee union activity. Employee Robert Longworth was a union supporter who signed a union authorization card early in the campaign and subsequently distributed similar cards to other employees. The ALJ found that sometime in October, while Longworth was driving a forklift with a number of authorization cards sticking out of his pocket, supervisor Graham "directed Longworth's attention away from himself, stepped up on the forklift, pulled one of the cards part way out of Longworth's pocket, saw what it was, and thrust it back." The ALJ did not find a violation of the Act, however, because he felt Graham had not interfered with Longworth's efforts to distribute the cards. He also noted that Graham had replaced the card after satisfying his curiosity. The Board rejected this finding and determined Graham's actions constituted unlawful surveillance in violation of § 8(a)(1).

Overt surveillance of employee union activity violates the Act when it reasonably tends to interfere with, restrain or coerce the employees in the free exercise of their rights. *Russell Stover Candies, Inc. v. N. L. R. B., supra,* 551 F.2d at 207; *N. L. R. B. v. Speed Queen, supra,* 469 F.2d at 191; *N. L. R. B. v. Hawthorn Co.,* 404 F.2d 1205, 1208–09 (8th Cir. 1969). The Board has previously found a violation where a plant supervisor secreted himself to observe employees distributing authorization cards and then confiscated those cards. *Benner Glass Co,* 209 NLRB 686, 86 LRRM 1189, *enf'd in an unpublished opinion,* 90 LRRM 2890 (5th Cir. 1974). While Graham did not confiscate Longworth's authorization cards, his conduct may be said to constitute the kind of unfair labor practice which tends to discourage employees from exercising their right to distribute such cards. At any rate, the Board independently found a violation based upon its view of the evidence. This it had a right to do, *see N. L. R. B. v. Hawthorn, supra,* 404 F.2d at 1209 n.5 and cases cited therein, and we feel that an evaluation of the record as a whole supports the Board's finding.

■ The next two alleged Gustine Plant violations involve the coercive interrogation of and the threatening remarks made to employee Kenneth Lay. In mid-November Gustine plant manager Whited stopped Lay in a parking lot and asked for information concerning union activities at the plant. When Lay denied any knowledge of union activity, Whited stated his believe that Lay had been distributing union authorization cards. Whited asserts that the conversation ended at this point, but the ALJ found Whited further responded to Lay's repeated denials by alluding to the fact that Whited had previously granted Lay's request for a shift transfer and suggesting that he would deny such requests in the future. On the basis of this factual finding, the ALJ determined the Company had committed an unfair labor practice by "interrogating an employee about his union activities and threatening reprisals for engaging in such activities."

The ALJ also found that approximately two months later Lay was again threatened by plant foreman Richard Vogt. The two men were working together on an assembly line when Lay asked Vogt why he was "so hot against the union." After a pause, Vogt responded by asking Lay: "What are you going to do for a job if the union don't [sic] get in?" A few days later Lay was reading a company notice that there would be no interference with employee union activities when Vogt joined him at the plant bulletin board. Lay pointed out the company policy against harassing pro-union employees to which Vogt responded: "Well

nobody else heard it but you and I. You can't prove it."

We agree with the ALJ and the Board that the Company committed two § 8(a)(1) violations by interrogating and threatening reprisals against Kenneth Lay. As to the coercive interrogation, we recognize that under some circumstances an employer may properly question employees about union activities.[2] Thus we stated in *N. L. R. B. v. Midwest Hanger Co. & Liberty Eng. Corp.,* 474 F.2d 1155, 1161 (8th Cir.), *cert. denied,* 414 U.S. 823, 94 S.Ct. 124, 38 L.Ed.2d 56 (1973), that we must look not only to the questioning itself but also to the circumstances surrounding the interrogation. In particular, we have noted five factors which should receive close attention. These are:

[A] history of employer hostility and discrimination, the nature of the information sought (*e. g.,* was the interrogator seeking information from which he could take action against individual employees), the identity of the questioner (*i. e.,* what was his position in the company), the place and method of interrogation, and the truthfulness of the reply (*e. g.,* did the interrogation inspire fear leading to evasive answers).

*N. L. R. B. v. Midwest Hanger Co., supra,* 474 F.2d at 1161, *quoting N. L. R. B. v. Ritchie Mfg. Co.,* 354 F.2d 90, 99 (8th Cir. 1966).

Consideration of several of these factors here supports the Board's finding of a violation. Intertherm had committed a previous violation at the plant by conducting unlawful surveillance. The questioner sought specific information about employee union activity at the plant. And, most importantly, the questioner was a high ranking Intertherm official who inspired fear in Lay and threatened reprisals when Lay gave evasive answers.

 Moreover, it is clear that Whited's statement threatening Lay with loss of privileges for engaging in protected activities is sufficient, standing alone, to violate the Act. *N. L. R. B. v. Louisiana Mfg. Co.,* 374 F.2d 696, 702 (8th Cir. 1967); *Jas. E. Matthews & Co. v. N. L. R. B.,* 354 F.2d 432, 439–44 (8th Cir. 1965). And, obviously, implied threats of discharge, such as that made by Vogt, are also violations. *Federal Prescription Service v. N. L. R. B.,* 496 F.2d 813, 816 (8th Cir.), *cert. denied,* 419 U.S. 1049, 95 S.Ct. 624, 42 L.Ed.2d 643 (1974); *N. L. R. B. v. Midwest Hanger Co., supra,* 474 F.2d at 1162; *N. L. R. B. v. Speed Queen, supra,* 469 F.2d at 192.

Two more alleged Gustine Plant violations relate to a company reprimand issued to employee Robert Longworth. Shortly before the election, the Union asked Longworth to substitute as an observer on election day. Longworth agreed to work the election and to attend a pre-election observer meeting on January 13, 1977. On the morning of the observer meeting day Longworth informed supervisor Graham of his need to leave work early to attend the meeting, and later that day plant manager Whited gave Longworth tacit permission to attend by instructing him to clock out when he left the assembly line.

Ten days later Longworth received a company reprimand signed by Graham. A clerk in the personnel office had routinely issued the reprimand without consulting a supervisor because Longworth had failed to work a full shift three times in one month. He had been late for work on January 12 and 19 and had left work early on January 13, the day of the observer meeting. Longworth immediately went to Whited and objected that he was being reprimanded for participating in union activities. Whited commented that acting as an observer had been voluntary on Longworth's part but promised to talk to Robert Long, the director of plant personnel, about the reprimand. On the following day Longworth,

2. We have stated that interrogation of employees may be permissible if (1) the employer has a valid purpose for obtaining information about the union's strength; (2) this purpose is communicated to the employees; and (3) the employees receive assurances that no reprisals will be taken. *N. L. R. B. v. Midwest Hanger Co. & Liberty Eng. Corp.,* 474 F.2d 1155, 1161 n.5 (8th Cir.), *cert. denied,* 414 U.S. 823 (1973).

after failing to hear from Whited, went to Long. Long explained that such reprimands automatically issue anytime an employee either arrives late or leaves early three times in one month. And he refused to make an exception to this policy for Longworth, reiterating Whited's comment that Longworth had voluntarily assumed his observer duties. An argument followed, with Longworth stating that such rigid company policies caused employees to unionize. Long replied that if Longworth were unhappy with the company, he should look for another job. The reprimand stayed in Longworth's personnel file until February 10 when, on advice of counsel, the company withdrew the reprimand and notified Longworth.

The ALJ found that Intertherm had not violated the Act by reprimanding Longworth. He observed that Longworth had not been reprimanded for acting as a union observer but for violating Intertherm's "consistently applied" tardiness policy. And, in his view, the company's refusals to immediately withdraw the reprimand were merely assertions of its right to maintain such a nondiscriminatory policy. However, he did find a violation in Long's recommendation that Longworth look elsewhere for a job because the statement was tantamount to a threat that the Company "considered engaging in union activity and continued employment essentially incompatible."

The Board agreed that Long's statement was a violation. Yet it found an additional violation with respect to the reprimand:

> [V]iewing the reprimand in light of [the Company's] well-established union animus, Long's threat to Longworth, and particularly [the Company's] prior indication of approval of Longworth's absence, the preponderance of the evidence established that Longworth was reprimanded in order to inhibit him and other employees from exercising their right to participate in the Board's election process.

■ After carefully reviewing the record, we determine that it does not contain substantial evidence supporting the Board's finding of a violation with respect to the Longworth reprimand. Intertherm was justified in maintaining a nondiscriminatory tardiness policy and did not apply this policy so as to discourage employees from engaging in activities protected by § 7 of the NLRA. While it is true that no reprimand would have issued had Longworth not participated in observing the election, the issuance of the reprimand occurred *after* the date of the consent election and only after a tardiness report on January 19. In the circumstances, we find no "chilling" effect upon Longworth in the exercise of his § 7 rights. We agree with the ALJ's finding that the company's initial refusal to withdraw the reprimand was primarily a defense of its tardiness policy rather than an effort to inhibit Longworth and other employees from participating in the Board's election. We note also that Intertherm did withdraw the reprimand and shortly thereafter promoted Longworth to a higher paying job. The totality of company behavior refutes the Board's contention that the company's action was more consistent with antipathy for union activity than with adherence to its personnel rules. *Cf. N. L. R. B. v. General Industries Electronics Co.,* 401 F.2d 297, 300–01 (8th Cir. 1968) (violation upheld where employer failed to consistently apply its tardiness policy and later refused to remove illicit reprimands from permanent employee records).

■ We do, however, agree that Long's remarks to Longworth about the reprimand, when taken in context, constitute a violation of the Act. We have stated that the effect of an employer's statements must be judged in the light of circumstances in which words innocent in and of themselves may be understood as threats; and the issue of whether such statements are threats is generally one of fact for the Board's initial consideration. *N. L. R. B. v. Crystal Tire Co.,* 410 F.2d 916, 918 (8th Cir. 1969). Longworth had worked for Intertherm for fourteen years and had never received a reprimand. Yet when Longworth objected to what he regarded as an unfair reprimand which impinged on his right to engage in union activities, Long suggested that Long-

worth "look elsewhere for a job." As the Board observed, this statement is essentially a thinly-veiled threat to fire Longworth for his union activities and is thus violative of the Act. *See, e. g., N. L. R. B. v. Crystal Tire Co., supra,* 410 F.2d at 918. (Management statement that if employees wanted a union they should work for another company held a violation.)

The Board found two additional violations at the Gustine Plant; and it deemed one of these violations sufficiently serious to warrant setting aside the January 14 consent election. We reject the Board's findings as to these last two alleged violations.

 The Board found a violation in supervisor Graham's polling of six employees concerning how they would vote in the upcoming consent election. Admittedly, such interrogation constitutes a violation of the Act absent unusual circumstances. *N. L. R. B. v. Harry F. Berggren & Sons, Inc.,* 406 F.2d 239, 243–46 (8th Cir.), *cert. denied,* 396 U.S. 823, 90 S.Ct. 64, 24 L.Ed.2d 74 (1969); *N. L. R. B. v. Louisiana Mfg. Co., supra,* 374 F.2d at 700–01. But Intertherm management took prompt and effective steps to remedy this violation which, in our opinion, make superfluous and counterproductive the Board's cease and desist order and its requirement that the Company post a Board notice.

On January 11, 1977 Graham, as a result of questions from his own supervisor, polled six employees about their voting intentions. On January 13 he apologized to the employees individually, admitting he should not have interrogated them. On that same day—the day before the election—Intertherm posted a public notice on the bulletin boards at all four St. Louis plants. This notice explained the polling incident; stated such activity was against company policy and would not occur again; and reported Graham's apology, as well as the fact that he had received a reprimand. Additionally, it included a comprehensive listing of the employees' rights under the NLRA.

The ALJ concluded that under the Board's prior decision in *Fashion Fair, Inc.,* 159 NLRB 1435, 1444 (1966), Intertherm had remedied the violation by making a timely public apology for Graham's actions. In *Fashion Fair* the Board set down the general procedure an employer must follow to remedy an unfair labor practice.

Unless properly and effectively neutralized, the impact of coercive action upon employees is not vitiated just because the illegal acts in question are subsequently rescinded. Merely making an apology to employees for the misconduct committed [is] ambiguous and insufficient without clearly identifying the wrongdoing, indicating recognition of the employees' organizational rights, and assuring them against recurrence of the offenses committed. Moreover, to be effective, a neutralization effort must be adequately publicized substantially to reach all employees.

The ALJ stressed that Intertherm's notice met all these requirements and noted that Graham had not committed any subsequent violations after the notice was posted. But the Board, over the dissent of one member, found the Company had not cured the violation because three additional violations were committed by other Intertherm supervisors after the notice was posted.[3] Also, Graham had committed a previous violation by removing an authorization card from employee Longworth's pocket; and the Company's notice had not disavowed that violation.

Dissenting Board Member Murphy would have adopted the ALJ's finding of no violation because Graham had not engaged in unlawful conduct after his apology and the three subsequent violations by other supervisors were unrelated to the illicit polling and did not negate the company's disavowal of Graham's conduct.

We agree with the ALJ and Board Member Murphy that the cease and desist order and Board notice relating to this incident

---

3. These violations were supervisor Sandbothe's covering of employee Gilliam's union insignia and the post-election reprimand and threatening of employee Longworth.

are not warranted. It is apparent that Intertherm made a good faith effort to remedy Graham's misconduct and in doing so followed the Board's *Fashion Fair* guidelines. The notice not only repudiated and apologized for the polling incident, it also provided an affirmative statement of the employees' rights. Further, it was posted immediately after the incident and before the election at all four St. Louis plants, even though the violation took place at only the Gustine facility. This notice properly dealt with the polling violation, and Graham's previous violation and the unrelated violations of two other supervisors should not operate to negate the company's remedial effort. We believe that self-initiated remedies such as this should be encouraged whenever possible.

The final violation found by the ALJ and the Board relates to a preelection speech made by Intertherm Vice President John Oxley. Oxley read a prepared speech to assembled employees at all four of the company's St. Louis plants. The Board asserts that one paragraph of this speech contains a threat of plant closure in violation of § 8(a)(1).

■ It is well established that employers have a free speech right to communicate their views on unionization to employees and that this right cannot be infringed by a union or the Board. *N. L. R. B. v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). Section 8(c) of the NLRA implements this first amendment right by providing that

> [t]he expressing of any views, argument, or opinion, or the dissemination thereof . . . shall not constitute or be evidence of an unfair labor practice under any of the provisions of this [Act] if such expression contains no threat of reprisal or force or promise of benefit.

29 U.S.C. § 158(c). This court not infrequently has assessed the extent of the protection afforded to an employer by that section and we will not restate the governing principles in detail here. *See, e. g., R. J. Lallier Trucking v. N. L. R. B., supra,* 558 F.2d at 1327; *N. L. R. B. v. Dixisteel Build-*

*ings, Inc.,* 445 F.2d 1260, 1263–64 (8th Cir. 1971); *N. L. R. B. v. Douglas & Lomason Co.,* 443 F.2d 291, 294 (8th Cir. 1971); *N. L. R. B. v. Crystal Tire Co., supra,* 410 F.2d at 916; *N. L. R. B. v. Louisiana Mfg. Co., supra,* 374 F.2d at 696; *N. L. R. B. v. Hawthorn Co., supra,* 404 F.2d at 1214. It suffices to say that although an employer has a constitutionally protected right of free speech, he must be "particularly careful if he not only expresses his opposition to unionization but also goes further and proposes to predict the adverse effects that unionization may have on his business, his employees, and their incomes or work opportunities." *R. J. Lallier Trucking, supra,* 558 F.2d at 1327.

■ In reviewing a challenged statement by an employer, we look to the context of its particular labor relations setting and balance the employer's right of expression against the equal right of employees to associate freely with a collective bargaining setting. And, as the Supreme Court has stated, any balancing of those rights must take into account "the economic dependence of the employees on their employers, and the necessary tendency of the former, because of [their] relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear." *N. L. R. B. v. Gissel Packing Co., supra,* 395 U.S. at 617, 89 S.Ct. at 1942.

■ The allegedly objectionable remarks made by Vice President Oxley are as follows:

> As I said, there is no magic in unions. If a company is competitive, if it manufactures a good product in an efficient and productive way, there is going to be job security whether you have a union or whether you do not. I have dealt with a number of unions in which I have had to shut down plants, or move them elsewhere. I've sat at the bargaining table and told an international union that you'll either have to agree to the company's position or we'll shut the plant down. They didn't believe me and we shut the plant down. These are not threats, these are simply facts showing what I think all

of you really understand. Whether you have a union or whether you do not have a union, a company must remain competitive and it must grow if it is going to succeed.

We have carefully considered these remarks in the context of the entire speech and with regard to the particular labor relations setting within which it was made. *N. L. R. B. v. Wilson Lumber Co.*, 355 F.2d 426, 429 (8th Cir. 1966). And, while it is apparent that Oxley took the precarious step of predicting the adverse effects that unionization might have on Intertherm, his remarks did not contain any implication that the company would shut down its plants on its "own initiative for reasons unrelated to economic necessities . . . ." *N. L. R. B. v. Gissel Packing Co., supra,* 395 U.S. at 618, 89 S.Ct. at 1942. In fact, Oxley was careful to state that his remarks were not threats but simply his view of the possible economic consequences of a union victory. Thus, we find no threat of retaliation based on misrepresentation or coercion and determine that the speech was protected by the first amendment and § 8(c) of the Act and cannot be deemed a § 8(a)(1) violation.

The ALJ recommended setting aside the company's victory in the January 14 consent election solely because of the remarks made by Oxley. He found and we do not disagree that the other pre-election violations by the company were too limited in their impact to justify setting aside the multiplant election. Oxley's speech, however, was deemed a "threat of vital significance" because it was delivered to over 400 employees at Intertherm's four plants. The Board adopted the ALJ's recommendation, setting aside the election and directing that a second election be held. Although we have determined that Oxley's speech did not constitute a violation, we nevertheless deny Intertherm's cross-petition for reinstatement of the election results because the Board's election order in its present posture is not ripe for review. *Marine Welding & Repair Works, Inc. v. NLRB*, 439 F.2d 395, 399 (8th Cir. 1971); *Orchard Corp. of America v. NLRB*, 408 F.2d 341, 342 n. 1 (8th Cir. 1969); *NLRB v. Burns Detective Agency*, 346 F.2d 897, 899 (8th Cir. 1965). Our decision does not prejudice the right of Intertherm to challenge the Board's set-aside order in future representation proceedings relating to a second election based upon the Union's original representation petition. *Orchard Corp. of America v. NLRB, supra,* 408 F.2d at 342 n. 1.

The Board's petition for enforcement is granted in part and denied in part as stated in this opinion.

Intertherm's cross-petition is denied.